UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| A., by his Parent and Next Friend Mr. A., and MR. A., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:11-CV-01381-GWC |
| HARTFORD BOARD OF EDUCATION and NEW BRITAIN BOARD OF EDUCATION, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| NEW BRITAIN BOARD OF EDUCATION, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:11-CV-01431-GWC |
| J.A., a Student, and MR. A., Parent and Next Friend of J.A., | ) ) ) | |
| Defendants. | ) ) | |

**OPINION AND ORDER RE:**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION TO SUPPLEMENT**
(Docs. 126, 128, 129, 198)

Plaintiffs A. ("Student"), a special education student, and his parent Mr. A. ("Parent"),

bring this suit under 20 U.S.C. § 1415(i)(3)(B) and 42 U.S.C. § 1983 against Defendants

Hartford Board of Education (HBOE) and New Britain Board of Education (NBBOE)

(collectively, "the boards"). (Doc. 19, Second Am. Compl.)[1] Plaintiffs claim that they are the

---

[1] The court previously granted Plaintiffs' Motion to prosecute the case under fictitious names. (*See* Doc. 11.) The administrative record, supplemental administrative record, and many

prevailing parties in *A. v. Hartford Board of Education et al.,* No. 11-0154 (Conn. Dep't of Educ.) (the "due process case"), and are therefore entitled to fees and costs under § 1415(i)(3)(B) and § 1983. Plaintiffs further claim that the August 2, 2011 Final Decision and Order ("hearing decision") in the due process case should be reversed insofar as it declined to provide Student with an in-home program.[2]

Consolidated with Plaintiffs' case is NBBOE's case against Student and Parent, docketed No. 3:11-CV-01431, in which NBBOE seeks reversal of the hearing decision to the extent it was adverse to NBBOE. In their Amended Answer to NBBOE's Complaint, Plaintiffs assert counterclaims against the boards for violating the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act, and for failing to implement the hearing decision. (Doc. 67 at 16–23.) For relief on those counterclaims, Plaintiffs seek compensatory and punitive damages, fees and costs, and injunctive relief. (*Id.* at 23–24.)

All parties have filed motions for summary judgment. (Docs. 126, 128, 129.) In their Motion, Plaintiffs argue that (1) the court should reject NBBOE's request for reversal of the hearing decision; (2) Plaintiffs are entitled to summary judgment on their Amended Counterclaim; and (3) Plaintiffs are prevailing parties and should be awarded costs, expenses, and fees in the amount of $439,915.88. (Doc. 126-1.) In its Motion, HBOE seeks summary judgment as to all claims against it, and argues that Plaintiffs' request for fees should be denied or reduced. (Doc. 128.) For its part, NBBOE seeks summary judgment on: (1) the portion of NBBOE's Complaint seeking reversal of the hearing decision insofar as it determined NBBOE

---

of the exhibits to the parties' Motions are sealed because Student's identifying information appears throughout those documents.

[2] The hearing decision is attached to Plaintiffs' Second Amended Complaint. (*See* Doc. 19-1.) The findings and conclusions of the hearing decision are briefly summarized below.

had failed to provide a free and appropriate public education during the 2009–2010 and 2010–2011 school years; (2) Plaintiffs' counterclaims; and (3) Plaintiffs' demand for attorneys' fees and costs. (Doc. 129.) Finally, Plaintiffs move to supplement their request for attorneys' fees, costs, and expenses, adding an additional $188,000 for a total request of $627,915.88. (Doc. 198.)

## Background

The parties have supplied extensive Local Rule 56(a)(1) statements with exhaustive details regarding numerous aspects of Student's educational and other history.  Based on the parties' statements and the court's review of the record, the court presents a relatively brief factual introduction here.  Additional facts included in the analysis below as necessary.[3]

**I.   Student's Early Education and Evaluations**

Student was born in 1998 and lives with his father and other family members in New Britain, Connecticut.  Parent was awarded sole custody of Student by the Connecticut Superior Court as a result of a marriage dissolution on March 29, 2005.  At all times relevant, NBBOE has identified Student as a child in need of special education and related services under the Individuals with Disabilities Education Improvement Act ("IDEA") under the disability category "Autism."

---

[3] Some of the citations that follow are to the sealed administrative record in this case. The court adopts the citation conventions used in in the hearing decision; exhibit numbers are preceded by a "P" for Parent's exhibits.  Citations to the transcripts from the hearings in the due process case (which also appear in the sealed administrative record) are denoted by "Tr.," the date of the testimony, the witness's identity, and a page number.

In 2001, Student commenced his education in NBBOE's schools in the Head Start program. (*See* P-1 at 1.) A Planning and Placement Team (PPT)[4] meeting was convened at the commencement of Student's Head Start program and evaluations were ordered. The PPT found that Student demonstrated significant delays in all developmental areas. Student was initially classified as Developmentally Delayed.

In 2004, the PPT ordered evaluations of Student to identify his programming needs, identify his special education diagnosis, and address Parent's concern about Student's behavior. At that time, Student was in kindergarten and enrolled in NBBOE's school system. (*See* P-6 at 1.) The diagnostic evaluation found that Student was functioning in the borderline range of intelligence. The Behavior Assessment for Children showed that Student had clinically significant levels of inattention and "atypicality" across settings. The Childhood Autism Rating Scales were suggestive of moderate autism and the Vineland Adaptive Behavior Scales revealed low levels of self-help skills in the areas of communication, daily living skills, and socialization. Student was found to be academically below grade level in all subject areas. (*Id.* at 7.)

A Physical Therapy Diagnostic Evaluation was performed. (*See* P-7.) The evaluator found that Student continued to demonstrate an inappropriate gait pattern that had not significantly changed with formal physical therapy (PT). The evaluator reported that continued PT would not impact Student's gait pattern and that the gait pattern did not prevent Student from participating in school-based activities. The evaluator concluded that PT should be discontinued. An Occupational Therapy Diagnostic Evaluation was conducted and the evaluator recommended that occupational therapy (OT) be continued.

---

[4] Under Connecticut law, a Planning and Placement Team is an individualized education program team as defined in the IDEA. *See* Conn. Agencies Regs. § 10-76a-1(14). The IDEA defines an individualized education program team at 20 U.S.C. § 1414(d)(1)(B).

A speech and language evaluation showed that Student's receptive and expressive language skills were below his age and grade equivalent peers. His language skills showed weakness in semantics, language structure, and integrative language skills. Student's speech intelligibility was moderately impaired.

In March 2004, a PPT was convened to review the results of the evaluations. (*See* P-10.) The PPT changed Student's classification to Autism and found, based on the evaluation, that PT should be discontinued. In 2006, the PPT recommended a psychological evaluation because Student exhibited disruptive, off-task behaviors that were affecting his academic performance. Dr. Felicia Morgan provided a consultation summary in which she noted that NBBOE had no consistent behavior plan. She recommended that a behavior plan needed to be developed with the focus on off-task behaviors, being appropriate with others, and following directions.

## II.    Plans for Student's Fifth Grade Year

On or about March 18, 2008, the PPT met in order to plan Student's 2008–2009 (fifth grade) school year. The PPT established detailed goals and objectives to address Student's reading deficits, math deficiencies in computation, reasoning skills, and written language skills. A Board Certified Behavior Analyst (BCBA) was not involved in Student's program. Parent requested an independent educational evaluation. The speech and language pathologist drafted Student's speech and language goals and objectives for the 2008–2009 school year. The speech and language goal was written to address Student's deficits in receptive and expressive language and improve Student's ability to comprehend class instructions and thereby increase his class participation. Student's goals and objectives were developed to reduce Student's impulsivity.

Parent requested a one-to-one special education teacher at a PPT meeting held on June 12, 2008. The team agreed to have the special education teacher work with Student on a

one-to-one basis for one hour each week in the resource room. The team agreed to provide Student with speech and language services during the summer of 2008.

### III.    Fifth Grade at Gaffney Elementary School in New Britain

During the 2008–2009 school year, Student was in a mainstream classroom with non-disabled peers with modifications. Student's paraprofessional worked with him one-to-one with the intent of making him independent. According to Student's teacher, he had improved in the fifth grade and was in fact functioning more independently. In the classroom, Student received instruction from the special education teacher, the regular education teacher, and a paraprofessional.

On or about July 2008, Student had a psychological evaluation performed by Erik A. Mayville, Ph.D., of the Institute for Educational Planning (IEP). (*See* P-51a.) Dr. Mayville found a marked difference between Student's reading decoding and reading comprehension abilities. In mathematics and oral language Student performed in the extreme low range. In his written language Student was only capable of completing one subtest. He performed in the high average range in spelling. In sentence and paragraph subtests his scores were below the level required for a norm-based score of these subtests. In the Peabody Picture Vocabulary Test, 3rd Edition, Student performed at a 5-year, 2-month age equivalent.

In the Vineland Adaptive Behavior Scales, 2nd Edition, Parent and his teacher completed the forms from which the scores were calculated. Parent scored Student as low in all domains while his special education teacher scored him as falling at moderately low adaptive levels. In the maladaptive behavior scale Student's level was clinically significant. The evaluator gave Parent and the special education teacher the Social Response Scale to complete. Parent reported that Student had social difficulties at home; the special education teacher reported the same was

6

true in the school setting. Parent's rating demonstrated severe impairment in contrast to the teacher's mild-to-moderate ratings.

Dr. Mayville recognized that developing an educational program for Student is a complex task. He made sixteen recommendations, including the following: (1) Student's program should be "overseen by a behavior specialist with experience designing behavior change programs for persons with [autism]" (P-51 at 17); (2) Student "should have access to a 1:1 teaching assistant" (*id.* at 18); (3) teaching staff should demonstrate competency in behavior analytic procedures; (4) behavior programs needed to be developed so as to reduce prompting; (5) a home-based program was needed; (6) carefully planned and sequenced language-comprehension and expression programming was needed; (7) the areas of Student's programming central to his social needs needed to be sequentially addressed.

## IV.    Plans for Sixth Grade and Transition to the Classical Magnet School in Hartford

The PPT met on March 16, 2009 to plan for Student's 2009–2010 (sixth grade) school year. Student had not mastered any of his goals from the 2008–2009 school year. A PPT meeting was held on April 27, 2009 to review Dr. Mayville's evaluation and Parent's request for evaluations. Dr. Mayville attended the meeting via telephone conference. Parent's request for an occupational therapy evaluation was denied as unwarranted "due to current evaluations & observations already conducted." (P-61 at 3.) Regarding Parent's request for a full PT evaluation, the team recommended "PT observation of [Student's] running, jumping, gross motor skills, [and] stair climbing." (*Id.* at 2.) The team granted Parent's request for 90 minutes per week of direct speech and language services. (*Id.*) Parent did not request due process hearings to the extent his requests were denied.

Parent entered Student into the Choice Lottery for the 2009–2010 school year. Student was selected for a slot at the Classical Magnet School ("Classical"). Classical is one of twelve regional magnet schools operated by HBOE pursuant to a Stipulated Agreement between the State of Connecticut and the plaintiffs in *Sheff v. O'Neill*, 678 A.2d 1267 (Conn. 1996). The overall purpose of magnet schools is to allow students to be educated in an ethnically and racially diverse educational setting. Approximately 50% of the seats at Classical are reserved for suburban students. The other 50% are for HBOE students. Parents who wish their children to attend any inter-district magnet school must place their names in a state-run lottery. Students are chosen at random. The parent must actively accept the seat that is offered. Classical does not have the right to refuse a seat to any student who has been accepted through the lottery system, even based on the student's special education needs. Classical does not have a BCBA on staff. Classical is closed for summer vacation and staff are not available.

On April 25, 2009, Parent signed a form authorizing Gaffney to release Student's records to Classical. (P-60.) Parent completed the Home Language Survey and signed the Classical Magnet School Compact. Parent indicated on the enrollment form that he wanted Student to be mainstreamed for special education. The special education teacher at Classical, Sharon McCutcheon, requested that Parent set up a PPT meeting with NBBOE school staff so that she could attend and facilitate Student's transition to Classical.

A PPT meeting was held on June 15, 2009 at the request of Parent to conduct a program review because of Student's proposed attendance at Classical. Two Classical special education teachers, including Ms. McCutcheon, attended the meeting. They attended in order to "have an opportunity to view the IEP and also to hear from the people who are currently implementing the IEP to have a better understanding of the child and the services that need to be put in place when

8

school starts." (Tr. Mar. 14, 2011 (McCutcheon), at 111.)  Parent informed the PPT that Student

was receiving outside services from physical and occupational therapists. Ms. McCutcheon told

the team that Classical had available "all pieces" to implement the IEP.  (*Id.* at 115.)  Ms.

McCutcheon explained to the PPT that students at Classical are fully included and participate in

all core classes including English, history, science, math, and Latin.  (*Id.* at 114.)

NBBOE had planned to enroll Student at a middle school within the New Britain public

school system.  On July 20, 2009, Parent met with NBBOE personnel and signed an agreement

to change Student's IEP without convening an PPT meeting.[5]  Parent was represented by an

advocate at the meeting.  Staff from Classical were not invited to the meeting, nor did any

Classical staff attend.  According to a note in the "summary" of the changes, Parent "request[ed]

for [Student] to attend Classical Magnet School in Hartford."  (P-68 at 4.)

The agreed-upon modifications to the IEP required that Student have a one-to-one

paraprofessional, and that speech and language services would be increase to 1.5 hours each

week.  A note in the "accommodations and modifications" section of the plan indicated that

Student would also receive "[b]ehavioral consultant support by an agency that has BCBA on

staff for a minimum of 5 hrs a week to begin with, with time adjusted depending on

progress/need."  (*Id.* at 6.)

According to Ms. McCutcheon, at some point after the July 20, 2009 meeting, the New

Britain public schools sent her a copy of the changes to the IEP.  (Tr. Mar. 14, 2011

(McCutcheon), at 126.)  Ms. McCutcheon discussed those changes with New Britain personnel;

she was concerned about the addition of the BCBA requirement because Classical did not have a

behavior consultant as part of its regular staff.  (*Id.*)  Based on a conversation with New Britain

---

[5] It is undisputed that there was a meeting, but it was apparently not a formal PPT
meeting.

special education coordinator Meg Walsh, Ms. McCutcheon understood that the BCBA services were to be put in place only if Student remained at the New Britain schools. (*Id.*)

## V.    Sixth and Seventh Grades at Classical

At the beginning of Student's attendance at Classical there was no problem with his behavior. Beginning in late January 2010, staff began seeing a change in Student's behavior. (Tr. Mar. 14, 2011 (McCutcheon), at 188.) Staff became concerned about Student's behavior after a February PPT meeting. (*Id.* at 189.) Beginning in March 2010, Student was removed from class because of disruptive behavior that impeded his learning and also affected his peers. Student was calling out and giggling out loud during classes.

After the February PPT meeting, there was a decline in Student's performance and he was being removed from class to be refocused. The November 2009 progress report for Student's communication goals showed that he was making satisfactory progress, but the February 2010 progress report showed his progress as unsatisfactory. Despite the July 20, 2009 amendment to the IEP adding the BCBA requirement, it is undisputed that a BCBA was not retained by NBBOE or by HBOE to manage Student's behavior. The circumstances relating to that failure are discussed in greater detail below.

Ultimately, a PPT meeting was held on May 21, 2010. The notes from that meeting indicate that Classical staff would develop a behavior plan to address Student's problematic behaviors. (P-88 at 3.) The notes also indicate that Parent would visit the autism class at NBBOE's Slade Middle School, but that the program at Classical would remain in place pending exploration of the program at Slade. (*Id.*) In a note to the PPT dated August 17, 2010, Parent stated that he visited and observed Slade's autism program, and that he did not believe that Slade was the right placement for Student. (P-91.) Parent asserted that, until Dr. Mayville could

evaluate Slade's program, Parent would "insist that the right placement is the Connecticut Center for Child Development [CCCD] in Milford, Ct." (*Id.*)

On or about September 13, 2010, Dr. Mayville completed a (second) psycho-educational evaluation of Student. (*See* P-96.) Dr. Mayville concluded that Student's school program was "not yet . . . appropriate," and issued sixteen recommendations. (*Id.* at 12–17.) Dr. Mayville reviewed the behavior plan that Classical had developed; he concluded that it was lacking in several respects (*see id.* at 3–4), and recommended a six-point behavior plan (*see id.* at 13–14). Dr. Mayville also concluded that Student "and his family are in desperate need of home-based programming." (*Id.* at 14.) Dr. Mayville also presented findings from his review of the program at Slade as a "prospective program" for Student.  He found that Slade's program was based on the "SCERTS" model (*id.* at 7), which Dr. Mayville did not recommend as an educational model for Student (*id.* at 15–16).  It is undisputed that Student remained at Classical for the 2010–2011 (eighth grade) school year.

**Procedural History**

Parent filed a hearing complaint with the Connecticut State Department of Education (CSDE) on October 7, 2010, asserting that the boards had failed to provide Student with a free and appropriate public education (FAPE) as required by the IDEA, and requesting an administrative hearing under 20 U.S.C. § 1415. (*See* P-111.)  Hearing Officer Justino Rosado heard thirteen days of testimony before issuing the 21-page August 2, 2011 Final Decision and Order.[6]  The Hearing Officer identified the following 12 issues for resolution (referring to NBBOE as the "Board"):

---

[6] Hearings were held in 2010 on December 2, 7, and 14, and in 2011 on January 25 and 26, February 9 and 28, March 9, 14, 15, 17, and April 4 and 6.  Transcripts of all of the hearings appear in the administrative record under seal.

1.      Was the program provided by the Board for the 2008–2009 school year appropriate and did it provide the Student with a free and appropriate education (FAPE) in the least restricted environment (LRE)?

2.      Was the program provided by the Board for the 2009–2010 school year appropriate and did it provide the Student with FAPE in the LRE?

3.      Is the program provided by the Board for the 2010–2011 school year appropriate and does it provide the Student with FAPE in the LRE? If not;

4.      Should the Student be placed at CCCD for the 2010–2011 school year in a year round program at the Board's expense?

5.      Should the Board provide transportation to CCCD for the 2010–2011 school year?

6.      Should the Board pay for an in-home program coordinated by a BCBA provided by CCCD?

7.      Should the Board pay for OT and PT evaluations of the Student by an evaluator chosen by the Parent?

8.      Should the Board provide Compensatory Education for the denial of FAPE for the 2008–2009 school year?

9.      Should the Board provide Compensatory Education for the denial of FAPE for the 2009–2010 school year?

10.     Should the Board provide Compensatory Education for the speech and language services that were in the IEP and not provided?

11.     Should the Board reimburse the Parent for therapeutic services provided by the Parent?

12.     Should the Board reimburse the Parents for the IEE performed by Dr. Mayville?

(Doc. 19-1 at 1–2, ¶¶ 1–12.)   The Hearing Officer then made 50 paragraphs of factual findings and 19 paragraphs of legal conclusions.  (*Id.* at 3–19.)

Finally, the Hearing Officer issued the following 10-paragraph order (referring to Classical as the "Magnet School"):

1.      The program provided by the Board for the 2008–2009 school year was appropriate and provided the Student with FAPE in the LRE.

2.      The program provided by the Board and the Magnet School for the 2009–2010 school year was not appropriate and did not provide the Student with FAPE in the LRE.

3.      The program offered by the Board and the Magnet School for the 2010–2011 school year was not appropriate and would not provide the student with FAPE in the LRE.

4.      The program at CCCD is not appropriate.

5.      There was insufficient evidence to show that the Student would benefit from an in-home program coordinated by a BCBA.

12

6. The Board shall provide independent occupational therapy and physical therapy evaluations of the Student. These evaluations shall be done by Connecticut Children Medical Center staff and their recommendations incorporated in the Student's IEP.

7. The Board shall hold a planning and placement team meeting within two weeks of the mailing of the decision.
   a. The Board shall invite Dr. Erik Mayville to the PPT and Dr. Mayville shall consult with the PPT in developing and implementing an appropriate special education program for the Student. If Dr. Mayville is not available the Institute for Professional Practice will be an adequate replacement.
   b. The program will be at the Board's Middle School.
   c. The program shall include a BCBA that shall work with the Student 5 hours per week. The BCBA shall do a functional behavior assessment of the Student and write a behavior management plan for the Student.

8. The Student is entitled to 90 school days of compensatory education in the form of after school speech and language therapy with a private speech and language pathologist chosen by the Board and the Magnet School for 2 hours each school day or 180 hours. The compensatory education shall be provided according to a schedule developed by the speech and language pathologist in consultation with the Parent. The compensatory education shall be provided during the 2011–2012 school year. The cost shall be divided equally by the Board and the Magnet School. The Board and the Magnet School shall provide transportation to and from the speech and language pathologist they have chosen. This compensatory education is for the denial of FAPE during the 2009–2010 school year for which both the Board and the Magnet School were responsible. If the Board and the Magnet School cannot agree on a pathologist, the Parent shall chose the pathologist and the Board and the Magnet School shall pay for transportation up to a 40 mile round trip limit.

9. The Board shall reimburse the Parent only for the IEE evaluation performed by Dr. Mayville on or about September 13, 2010 to the extent that the Parent incurred out of pocket expenses. The Parent shall provide the Board with a copy of the receipt or the cancelled check for his out of pocket payment.

10. The Board does not have to reimburse the Parent for the therapeutic services provided by the Parent as there was no evidence of any cost incurred.

(Doc. 19-1 at 19–20, ¶¶ 1–10.)

Plaintiffs filed their Complaint in this court case on September 2, 2011. (Doc. 1.) In November 2011, the court consolidated the action with NBBOE's case, No. 3:11-CV-01431.

(Doc. 23.)  On October 8, 2013, the court issued a 57-page ruling which, among other things, granted HBOE's motion to dismiss Plaintiffs' claims for punitive damages, but denied HBOE's motion to dismiss in all other respects. *A. ex rel. A. v. Hartford Bd. of Educ.*, 976 F. Supp. 2d 164 (D. Conn. 2013).[7]

All parties filed motions for summary judgment on March 4, 2014.  (Docs. 126, 128, 129.)  On October 31, 2014, as briefing on the motions was nearing completion, Plaintiffs filed a Motion to Supplement their request for attorneys' fees. (Doc. 198-1.)  Briefing on that motion as well as the summary judgment motions was complete on January 26, 2015.  The case was transferred to the undersigned on June 29, 2015.  (Doc. 219.)  The court heard oral argument on the summary judgment motions on February 18, 2016.  (Doc. 221.)  The parties filed post-hearing memoranda, the most recent of which was filed on May 5, 2016.  (*See* Docs. 222, 229, 232-1.)

## Analysis

### I.    Summary Judgment Standard

As to the portions of these consolidated cases that seek review of the hearing decision, the summary judgment standard is modified.  In reviewing the administrative proceedings in an IDEA case, the summary judgment procedure "involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) (per curiam) (quoting

---

[7] A reasonable reader of this 2016 opinion and the court's 2013 opinion might observe that at the time of the earlier decision, the court had before it almost the same record that the court has reviewed in rendering this decision. *See id.* at 172 (court in 2013 opinion had examined supplemental administrative record).  The reader might wonder why the case was not converted to summary judgment and resolved at that earlier time.  However, the court elected not to convert to summary judgment, and instead ruled on HBOE's motion to dismiss applying the ordinary Rule 12(b) standards.  At this point in the life of the case, that election is water over the dam.

*A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)). "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* (quoting *A.C.*, 553 F.3d at 171). The Hearing Officer's decision receives no deference, however, on questions of interpretation of law. *See Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997).

With respect to the other claims in this case, the ordinary summary judgment standard applies. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether there is a genuine dispute of material fact, "[a]ll reasonable inferences must be construed in the nonmoving party's favor." *Hill v. Curcione*, 657 F.3d 116, 124 (2d Cir. 2011). Initially the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion has been made, the burden shifts to the nonmoving party to set out specific facts showing a genuine issue for trial. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996). When addressing cross-motions for summary judgment, the court "evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207, 216 (2d Cir. 2015) (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

## II.    Review of the August 2, 2011 Final Decision and Order

In their summary judgment motion, Plaintiffs seek reversal of the hearing decision only insofar as it declined to grant Student an in-home program. (Doc. 126-1 at 93.) NBBOE seeks summary judgment on its argument that the hearing decision should be reversed to the extent that it attributes to NBBOE any responsibility for Student's program during the 2009–2010 and 2010–2011 school years. (Doc. 136 at 33.) Alternatively, NBBOE seeks summary judgment reversing the portion of the hearing decision that concluded NBBOE had committed violations warranting compensatory education. (Doc. 136 at 43–48.) HBOE has not appealed the hearing decision. (*See* Doc. 152 at 2 n.1.)

### A.     Decision to Hold NBBOE Liable

The Hearing Officer concluded that, for the 2009–2010 and 2010–2011 school years at Classical, the program provided by *both* NBBOE and HBOE "was not appropriate and did not provide the Student with FAPE in the LRE." (Doc. 19-1 at 19, ¶¶ 2–3.) According to the Hearing Officer, *both* NBBOE and HBOE "interfered with the Parent's right to fully participate in PPT decisions by failing to call a PPT meeting when it became clear to [Classical] that the services added by the July 20, 2009 Amendment to the IEP would not be implemented." (*Id.* at 17, ¶ 12.) The Hearing Officer concluded:

> Given the level of maladaptive behavior, the proper course was for [Classical] to notify [NBBOE] of the need for a PPT meeting and for [NBBOE] to convene a PPT so that the requirement of a skilled behavior specialist be used in conjunction with the Student's program as was added by the July 20, 2009 Amendment, but not implemented at [Classical].

(*Id.*)

The Hearing Officer acknowledged that Classical had failed to implement the behavioral-specialist requirement, but that *both* boards were responsible for the violation because they both failed to request a PPT meeting to discuss the deficiency and target Student's unique needs. (*Id.*)

16

The Hearing Officer found that neither board called a PPT to discuss developing a behavior plan until the May 21, 2010 PPT meeting. (*Id.*) The Hearing Officer indicated that that discussion was too late (*see id.* (May 21 PPT meeting occurred "four months after the teaching staff concluded that the Student's behavior was impeding his education")), and concluded that the behavior plan that was finally created was "inadequate" (*id.*).

The Hearing Officer also concluded that both boards failed to have the PPT determine whether Classical had an appropriate program for Student, and failed to recognize Student's "downward spiral," thereby improperly continuing his placement at Classical for the 2010–2011 school year. (*See id.* at 18, ¶ 13.) According to the Hearing Officer, the boards did not have to continue a placement that was not providing Student with minimal benefit, and "could have filed for due process and challenged the requested placement of the Student as not providing FAPE in the LRE." (*Id.*)

NBBOE asserts that it was error to find NBBOE liable, arguing that, after Parent "unilaterally" decided to place Student at Classical, the responsibility for providing an education program to Student in the 2009–2010 and 2010–2011 school years belonged solely to Classical (and by extension, HBOE). (Doc. 136 at 33; *see also* Doc. 181 at 5.) NBBOE relies upon the following provision of Connecticut law, which appears in a section regarding the operation of interdistrict magnet schools:

> *In the case of a student identified as requiring special education, the school district in which the student resides shall: (1) Hold the planning and placement team meeting for such student and shall invite representatives from the interdistrict magnet school to participate in such meeting; and (2) pay the interdistrict magnet school* an amount equal to the difference between the reasonable cost of educating such student and the sum of the amount received by the interdistrict magnet school for such student pursuant to subsection (c) of this section and amounts received from other state, federal, local or private sources calculated on a per pupil basis. Such school district shall be eligible for reimbursement pursuant to section 10-76g. *If a student requiring special*

> *education attends an interdistrict magnet school on a full-time basis, such*
> *interdistrict magnet school shall be responsible for ensuring that such student*
> *receives the services mandated by the student's individualized education program*
> *whether such services are provided by the interdistrict magnet school or by the*
> *school district in which the student resides.*

Conn. Gen. Stat. § 10-264*l*(h) (emphasis added).  NBBOE argues that, under § 10-264*l*(h), it had

no legal obligation to ensure the provision of Student's IEP services and no right to override

HBOE.  (Doc. 136 at 42; *see also* Doc. 181 at 1.)

A Connecticut court interpreting § 10-264*l*(h) would seek to give effect to the intent of

the legislature, and would begin by considering the text of the statute and its relationship to other

statutes.  *In re Nevaeh W.*, 120 A.3d 1177, 1182 (Conn. 2015); *see also* Conn. Gen. Stat. § 1-2z

(plain meaning rule).  Here, the plain text of § 10-264*l*(h) required NBBOE to hold the PPT

meetings for Student.  The provision requiring HBOE to ensure that Student received the

services mandated by his IEP does not withdraw NBBOE's responsibility to hold the PPT

meetings.  For the reasons described below, the Hearing Officer's conclusions are consistent

with § 10-264*l*(h).

The Hearing Officer found that NBBOE improperly failed to call a PPT meeting when it

became clear to Classical that the services added by the July 20, 2009 Amendment to the IEP

would not be implemented.  NBBOE argues that it had no reason to call the meeting earlier,

because Classical never informed NBBOE of the need for an earlier meeting.  (Doc. 181 at 10–

11.)  According to NBBOE, the Hearing Officer "expressly acknowledged that Classical Magnet

did *not inform New Britain* of the need for a PPT meeting." (*Id.* at 10.)  In support, NBBOE

cites the Hearing Officer's statement quoted above:

> Given the level of maladaptive behavior, the proper course was for [Classical] to
> notify [NBBOE] of the need for a PPT meeting and for [NBBOE] to convene a
> PPT so that the requirement of a skilled behavior specialist be used in conjunction

with the Student's program as was added by the July 20, 2009 Amendment, but not implemented at [Classical].

(Doc. 19-1 at 17, ¶ 12.)[8]

The Hearing Officer's 50-paragraph "Findings of Fact" do not include explicit findings on whether or when—after the February 25, 2010 PPT but before the May 21, 2010 PPT— Classical notified NBBOE of the need for another PPT to address Student's maladaptive behavior.  However, the Hearing Officer's statement about the "proper course" fairly suggests that he found that Classical failed to timely notify NBBOE of the need for a PPT meeting.  The Hearing Officer's decision holding HBOE liable suggests that same thing.  Nevertheless, Plaintiffs and HBOE both assert that Classical *did* notify NBBOE.  (*See* Doc. 196 at 16–18; Doc. 197 at 34.)

The record reveals some evidence that, after the February 25, 2010 PPT, Classical did attempt to schedule another PPT to address Student's behavior.  HBOE logged attempts to seek Parent's participation in a PPT after February 25, 2010, beginning with a March 8, 2010 phone call from NBBOE.  (P-104A at 7.)  The additional PPT was initially scheduled to address "extended-year services."  (Tr. Mar. 14, 2011 (McCutcheon), at 177.)  HBOE's log shows multiple communications after March 8—through April and early May—attempting to find dates that worked for all of the PPT participants, including Parent and his advocate.  (*See* P-104A at 7–8.)  MS. McCutcheon testified that she was involved in attempting to schedule a further PPT for dates in late April and in May.  (Tr. Mar. 14, 2011 (McCutcheon), at 177–80.)  She also testified that, at some point during the process to schedule the additional PPT, she notified Nancy

---

[8] NBBOE asserts that the Hearing Officer found that Classical had "not implemented" the requirement of notifying NBBOE of the need for a PPT meeting.  (*See* Doc. 181 at 11.)  To the contrary, what the Hearing Officer found that Classical had "not implemented" was the requirement that a skilled behavior specialist be used in conjunction with Student's program.

Hasbani of NBBOE that Classical had noticed a decline in Student's behavior after the February 25, 2010 PPT. (*See id.* at 178.) Given that attempts to schedule another PPT began on March 8, 2010, it seems unlikely that the PPT could have occurred earlier than May 21, 2010— even if Classical had notified NBBOE of the concern about behavior earlier.

In any case, the Hearing Officer's conclusion on this issue was broader than a concern that no PPT was called quickly enough after February 25, 2010 to address Student's declining behavior in winter and early spring 2010. Instead, the Hearing Officer found that NBBOE failed to call a PPT meeting "when it became clear to [Classical] that the services added by the July 20, 2009 Amendment to the IEP would not be implemented." (Doc. 19-1 ¶ 12.) The July 20, 2009 Amendment included a requirement of a "[b]ehavioral consultant support by an agency that has BCBA on staff for a minimum of 5 hrs a week to begin with, with time adjusted depending on progress/need." (P-68 at 6.) It is undisputed that NBBOE informed Classical that a behavioral consultant had been added to the IEP. New Britain special education coordinator Meg Walsh testified that Classical was informed because the amendment was sent to Classical. (Tr. Mar. 9, 2011 (Walsh), at 202.) Ms. McCutcheon from Classical testified that she received a copy of the changes to the IEP from NBBOE. (Tr. Mar 14, 2011 (McCutcheon), at 126.)

There was apparently some confusion as to whether the BCBA requirement applied to Classical. Classical did not have a behavior consultant as part of its regular staff. Ms. McCutcheon testified that she understood from a conversation with Ms. Walsh that the behavioral consultant was to be provided only if Student attended Slade. (*See id.*; *see also* Tr. Mar. 15, 2011 (McCutcheon), at 141.) In contrast, Ms. Walsh testified that she never told Ms. McCutcheon that the behavioral consultant was only relevant if Student attended Slade. (Tr. Apr. 6, 2011 (Walsh), at 109.) In any case, it is undisputed that a PPT meeting was never called

to discuss the issue.  It is also undisputed that a BCBA was not retained by either NBBOE or by Classical to manage Student's behavior.

Here, it is unnecessary to determine whether the July 20, 2009 Amendment in fact only required a BCBA if Student attended Slade.  It is also unnecessary to resolve the dispute over whether Classical took "no action" to address the issue.[9]  Even assuming that the boards attempted to schedule a PPT in fall 2009, and assuming that the issue of the BCBA would have been on the agenda,[10] it does not appear that any further attempts were made to resolve the issue after Parent canceled the meeting scheduled for October 29, 2009.  (*See* P-104 at 100, 108.)[11] Moreover, it does not appear that the issue of the BCBA was addressed or resolved even at the February 25, 2010 PPT.[12]  The record supports the Hearing Officer's conclusion that both boards failed to take up and resolve the issue presented by the BCBA requirement that appeared in the IEP when Student began attending Classical.

The Hearing Officer also found that NBBOE improperly failed to have the PPT determine whether Classical had an appropriate program for Student.  The Hearing Officer did not fault NBBOE for failing to successfully change or override Student's placement at Classical

---

[9] Classical asserts that, beginning in fall 2009, Ms. McCutcheon made significant attempts to call a PPT meeting without success.  (*See* Doc. 174 ¶ 42.)

[10] The correspondence regarding attempts to schedule a PPT in fall 2009 (*see* P104 at 70–118) does not describe what the agenda would have been.

[11] The court recognizes that Parent may share some of the responsibility—the record reveals numerous instances of difficulties in reaching him by phone or email and in receiving responses from him on a variety of matters.  The Hearing Officer did not find, however, that Parent caused any denial of a FAPE, and the court does not disturb that conclusion.

[12] The PPT cover page for the February 25, 2010 PPT meeting indicates that the meeting was called to conduct an annual review, but not to review, revise, or develop the IEP.  (P-77 at 1.)  The cover page also states that the February 25, 2010 PPT is not an amendment to the current IEP.  (*Id.*)

21

at a PPT meeting. The fault was for failing to have a PPT consider that issue, which, in turn, meant the neither board invoked the due process procedure to resolve any impasse at the PPT.

NBBOE asserts that the PPT lacked authority to change Student's placement at Classical, and that only Parent had that authority. (Doc. 136 at 42.) NBBOE cites *Student v. Winchester Board of Education*, Case No. 10-0069 (Feb. 4, 2010), noting that that decision affirms that a PPT could decide to change a student's placement. (*See* Doc. 181 at 9–10.)[13] It is true that, since Parent was a member of the PPT, as long as he opposed withdrawing Student from Classical, the PPT could not achieve consensus on that issue. *See A.S. ex rel. P.B.S. v. Bd. of Educ. for Town of W. Hartford*, 47 Fed. App'x 615, 616 (2d Cir. 2002) (student's father's disagreement prevented the required consensus for PPT to decide placement). However, such an impasse may be resolved at a due process hearing. *See id.* (after PPT was unable to reach consensus regarding placement, school board requested a due process hearing). Here, NBBOE failed to have the PPT consider whether Classical was an appropriate placement for Student, and also failed to employ the due process procedure that was available to resolve any impasse in the PPT.

**B.     Decision to Order Compensatory Education**

The Hearing Officer concluded that Student was entitled to 90 school days of compensatory education "in the form of after school speech and language therapy with a private speech and language pathologist chosen by [NBBOE] and [Classical] for 2 hours each school day or 180 hours," with the cost divided equally between the two boards. (Doc. 19-1 at 20, ¶ 8.) NBBOE asserts that the Hearing Officer erred in ordering it to provide compensatory education,

---

[13] A copy of the *Winchester* decision in that case appears in the record as Doc. 181-2. *Winchester* involves what is now Conn. Gen. Stat. § 10-66ee(d)(3) (regarding charter schools) rather than § 10-264*l*(h) (regarding interdistrict magnet schools), but both statutory provisions contain substantially the same language.

arguing that there was no factual or legal basis for that determination. (Doc. 136 at 45.)

Plaintiffs maintain that the Hearing Officer properly ordered NBBOE to provide compensatory

education. (Doc. 169 at 30–37.)

NBBOE and Plaintiffs disagree about the law pertaining to when compensatory education

can be ordered. NBBOE relies upon *Somoza v. New York City Department of Education*, where

the court stated that "[a]n award of compensatory education is appropriate *only for gross*

*violations of the IDEA*." 538 F.3d 106, 108 n.2 (2d Cir. 2008) (emphasis added) (citing *Garro v.*

*State of Conn.*, 23 F.3d 734, 737 (2d Cir. 1994)). However, as this court has previously

observed, the "gross violation" requirement for ordering compensatory education "has been

applied only to cases involving claimants over the age of 21." *P. ex rel. Mr. & Mrs. P. v.*

*Newington Bd. of Educ.*, 512 F. Supp. 2d 89, 112 n.13 (D. Conn. 2007), *aff'd*, 546 F.3d 111

(2d Cir. 2008); *see also Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 456 n.15 (2d Cir. 2015)

("Because the obligations imposed by the IDEA generally terminate when a child reaches the age

of 21, compensatory education 'is unavailable to a claimant over the age of twenty-one in the

absence of gross procedural violations.'" (quoting *Garro*, 23 F.3d at 737)).

Here, Student was under 21 at the time of the August 2, 2011 Final Decision and Order.

The Hearing Officer was therefore not required to find a "gross violation" before ordering

compensatory education. As discussed above, the Hearing Officer found that both boards had

committed FAPE violations. The court finds no error in the award of compensatory education.

### C.   Denial of In-Home Program

The sole portion of the hearing decision that Plaintiffs challenge is the Hearing Officer's

conclusion that there was "insufficient evidence to show that the Student would benefit from an

in-home program coordinated by a BCBA." (Doc. 19-1 at 19, ¶ 5.) Plaintiffs assert that they

offered substantial evidence in support of their claim for an in-home program, and that the

Hearing Officer failed to mention or evaluate that evidence.  (Doc. 126-1 at 93.)  HBOE

maintains that the Hearing Officer's decision on that point should not be reversed, and that even

if it is reversed, then under Conn. Gen. Stat. § 10-264*l*(h)(2), the in-home program should be

awarded solely against NBBOE.  (Doc. 173 at 30.)  NBBOE contends that Plaintiffs' remedy

was to file another due process hearing, and thus the court lacks subject-matter jurisdiction over

Plaintiffs' demand for in-home services.  (Doc. 181-1 at 18.)

      1.     **Jurisdiction**

      Regarding jurisdiction, it is true that, on March 5, 2012, the PPT declined in-home parent

training, reasoning that there was no evidence "that what occurs at home has an impact on

[Student's] ability to access his education program."  (Doc. 131-10 at 3.)  If Plaintiffs disagreed

with that determination, a due process hearing would have been the next step.  However,

Plaintiffs are not challenging that determination, but are instead challenging the August 2, 2011

decision by the Hearing Officer.  The court has jurisdiction to review that decision.

      A separate issue of jurisdiction is the question of mootness: the court lacks jurisdiction to

adjudicate moot claims.  *See Granite State Outdoor Advertising, Inc. v. Town of Orange, Conn.*,

303 F.3d 450, 451 (2d Cir. 2002) (per curiam) ("[M]ootness divests a federal court of jurisdiction

to adjudicate the merits of a claim . . . .").  At the February 18, 2016 hearing, the court inquired

whether Plaintiffs' claim for in-home services remained a live issue.  Plaintiffs responded that it

was, asserting that students can continue to receive "transition services" under the IDEA until

age 21.

      As of the date of this decision, Student is approaching his 18th birthday.  But Student's

age is not the only consideration; the court considers below whether his graduation status has any

impact on the mootness analysis. Assuming that Student progressed through high school from 2012 through 2016 and has graduated, he would no longer be entitled to a free and appropriate public education. *See* 20 U.S.C. § 1412(a)(1)(B)(i) (obligation to provide FAPE does not apply to children aged 18 through 21 "in a State to the extent that its application to those children would be inconsistent with State law or practice"); Conn. Gen. Stat. § 10-76d(b) (school districts' obligation to provide special education "shall terminate when such child is graduated from high school or reaches age twenty-one, whichever occurs first"); *see also M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 201, 218 (D. Conn. 2008) (Connecticut student, upon turning 21 or graduating from high school, was no longer eligible for a FAPE).

The court concludes, however, that even if Student has graduated, his appeal of the hearing officer's denial of an in-home program is not moot. The relief Plaintiffs seek is essentially compensatory education in the form of "transition services," as defined by 20 U.S.C. § 1401(34). The court has authority to award relief in the form of compensatory education, even for individuals who have aged out of the special education system. *Fetto v. Sergi*, 181 F. Supp. 2d 53, 68 (D. Conn. 2001). Similar logic holds for individuals who have graduated. If NBBOE or HBOE failed to comply with the IDEA—and in particular the provision of appropriate related services—then relief in this court is available. *See id.* at 71 (if plaintiff believed that related services were deficient, he could pursue his remedies against the board of education).

### 2.    Analysis of Hearing Officer's Conclusion

The relevant evidence before the Hearing Officer included Dr. Mayville's written psychoeducational assessments dated October 2, 2008 (P-51a) and October 26, 2010 (P-96), as well as testimony by Dr. Mayville at the December 14, 2010 hearing and by Student's

grandmother at the December 7, 2010 hearing.[14]  Dr. Mayville conducted assessments on June 6,

July 15, and July 21, 2008, and in an October 2, 2008 assessment, he asserted that:

> [Student] should have home-based behavior programming focused on reducing
> problem behavior [and] increasing competence in daily living skills.  Such
> support should also be overseen by a behavioral specialist as described above,
> with approximately 10 intervention hours scheduled to begin with.  Efforts should
> be made to coordinate home and school intervention efforts through regular
> meetings (e.g. 1–2 times per month).

(P-51a at 19.) Dr. Mayville conducted assessments on April 20 and September 13, 2010, and in

an October 26, 2010 report, he opined:

> [Student] and his family are in desperate need of home-based programming.  This
> programming should be behaviorally based and focused on reducing problem
> behavior as well as increasing competence in daily living skills.  He should
> receive in-home and community support to address his needs in these
> environments.  Such support should also be overseen by a behavioral specialist as
> described above, with approximately 10 intervention hours scheduled to begin
> with.  Efforts should be made to coordinate home and school intervention efforts
> through regular meetings (e.g. 1–2 times per month).

(P-96 at 14.)

Dr. Mayville also testified at the December 14, 2010 hearing that, although he did not

evaluate Student at home, he did perform assessments based on reports from Parent.  (Tr.

Dec. 14, 2010 (Mayville), at 49.)  Dr. Mayville also observed Student at his office when he

tested Student.  (*Id.*)  Based on his observations and the problem behaviors reported by Parent,

Dr. Mayville testified that his opinion was that a home component was necessary to provide

Student with an appropriate educational program.  (*Id.* at 51.)  Dr. Mayville testified that his

recommendation was "a pretty common recommendation" and that children with autism "have

autism everywhere, they don't just have it in the classroom."  (*Id.*)  Student's grandmother also

---

[14] Plaintiffs also rely on recommendations offered by Dr. Zbigniew Golonka to the PPT
on March 5, 2012.  (*See* Doc. 121-2 at 37–38.)  As noted above, that later decision by the PPT is
not under review here, and Dr. Golonka's recommendations were not before the Hearing Officer.

testified that Student exhibited behavior problems at home, including tantrums, inappropriate touching, and foul language. (Tr. Dec. 7, 2010 at 93–94.)  In continued testimony on January 25, 2011, Dr. Mayville testified that a home-based program was a necessary component of Student's special education program because "clinically he needs it. . . . [Given] the severity that's been reported of his adaptive behaviors and his problematic behaviors at home . . . it's something that's a crucial part of [Student's] program." (Tr. Jan. 25, 2011 (Mayville), at 53.)

In his findings of fact, the Hearing Officer acknowledged much of the above evidence. The Hearing Officer found that the results of Dr. Mayville's 2008 assessment showed that Student "had social difficulties at home and in the school setting" and that the problems "appeared less evident in the school environment" because Parent's reports "demonstrated severe impairment in contrast to the teacher's mild to moderate ratings." (Doc. 19-1 at 6, ¶ 17.)  The Hearing Officer also recognized that in 2008 Dr. Mayville recommended, among other things, a home-based program. (*Id.* at 7, ¶ 18.) The Hearing Officer recounted some of the results from Dr. Mayville's 2010 evaluation, including Student's low scores in an assessment tool that measured "communication, daily living and social skills in the home and community environment." (*Id.* at 13, ¶ 50.)

The IDEA does not guarantee every possible educational accommodation. *See Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012) ("The IDEA guarantees only that students with disabilities are provided with an appropriate education, not one that provides everything that might be thought desirable by loving parents." (internal quotation marks omitted)).  "A state satisfies its obligation to provide a free *appropriate* public education if it 'provide[s] a disabled child with meaningful access to an education' even if the state 'cannot guarantee totally successful results.'" *Id.* (alteration in original) (quoting *Walczak v. Florida*

27

*Union Free Sch. Dist.*, 142 F.3d 119, 133 (2d Cir. 1998)). On the other hand, the IDEA recognizes that "related services" may be "required to assist a child with a disability to benefit from special education." *See* 20 U.S.C. § 1401(26). Dr. Mayville stated in his 2010 report that Student and his family needed home-based programming, and testified that a home component was necessary to provide Student with an appropriate educational program.

Here, neither school board contends that there is any competing opinion in the record suggesting that an in-home program was unnecessary; the court has discovered no such opinion in its review of the record. *Cf. M.L. v. N.Y.C. Dep't of Educ.*, No. 1:13-cv-00574(ALC)(JLC), 2014 WL 1301957, at *11 (S.D.N.Y. Mar. 31, 2014) (failure to recommend continued home-based services did not deny a FAPE to autistic student; coordinator and supervisor of home-based program stated that student would make progress without the home-based program, even if not at the same rate). Although both NBBOE and HBOE cross-examined Dr. Mayville, (*see* Tr. Jan. 25, 2011 (Mayville), at 87–166), the Hearing Officer's factual findings do not suggest any adverse credibility determination. Ultimately, the court cannot discern from the Hearing Officer's written decision any basis for the conclusion that there was insufficient evidence to show that Student would benefit from an in-home program coordinated by a BCBA.[15]

The court will therefore reverse the Hearing Officer's decision insofar as it denied a home-based program. Although Plaintiffs have requested that this court enter an order requiring a home-based program (*see* Doc. 19 at 4), the court concludes that remand is more appropriate.

---

[15] HBOE says that Plaintiffs are now requesting in-home *parent training*, which HBOE says is a type of in-home program that was not addressed in the original hearing decision. (Doc. 173 at 30.) That only reinforces the point, however: Dr. Mayville opined that Student *and his family* needed home-based programming. To the extent that the Hearing Officer concluded that there was insufficient evidence to support in-home parent training, the court similarly can find no basis for that determination.

On remand, the Hearing Officer will be able to make additional findings, if necessary, and provide guidance on the details of an in-home program, if he finds such a program is warranted.[16]

## III.    Implementation of the August 2, 2011 Final Decision and Order

The hearing decision did not end the disputes between Plaintiffs and the school boards—in fact, disputes have been ongoing since the hearing decision was issued.  As described below, Plaintiffs concluded that the boards had failed to implement the hearing decision in a variety of ways, and initiated action with CSDE under its complaint resolution process (CRP).  Plaintiffs also argued in this court action that NBBOE and HBOE are liable under the ADA, § 504 of the Rehabilitation Act, and 42 U.S.C. § 1983, asserting that, since the hearing decision, NBBOE and HBOE have failed and refused to implement that decision, and have interfered with implementation of the decision.  (Doc. 67 at 18–19.)

The court begins by describing the factual and procedural history relating to the post-hearing conduct.  The court then turns to the issue of recent action in the CRP, which NBBOE raised at the court's February 18, 2016 hearing.  Finally, the court analyzes Plaintiffs' ADA, § 504, and § 1983 claims.

### A.    Background Relating to Post-Hearing Conduct

Plaintiffs' claims before the CSDE and in this court focus on the following orders in the August 2, 2011 hearing decision:

> 7.    The Board shall hold a planning and placement team meeting within two weeks of the mailing of the decision.

---

[16] This conclusion makes it unnecessary to consider here HBOE's assertion that an order requiring in-home services should issue solely against NBBOE under Conn. Gen. Stat. § 10-264*l*(h).

    a.  ["Independent consultant" provision.] The Board shall invite Dr. Erik Mayville to the PPT and Dr. Mayville shall consult with the PPT in developing and implementing an appropriate special education program for the Student. If Dr. Mayville is not available the Institute for Professional Practice [IPP] will be an adequate replacement.

    b.  The program will be at the Board's Middle School.

    c.  The program shall include a BCBA that shall work with the Student 5 hours per week. The BCBA shall do a functional behavior assessment [FBA] of the Student and write a behavior management plan for the Student.

8.    The Student is entitled to 90 school days of compensatory education in the form of after school speech and language therapy with a private speech and language pathologist chosen by the Board and the Magnet School for 2 hours each school day or 180 hours. The compensatory education shall be provided according to a schedule developed by the speech and language pathologist in consultation with the Parent. The compensatory education shall be provided during the 2011–2012 school year. The cost shall be divided equally by the Board and the Magnet School. The Board and the Magnet School shall provide transportation to and from the speech and language pathologist they have chosen. This compensatory education is for the denial of FAPE during the 2009–2010 school year for which both the Board and the Magnet School were responsible. If the Board and the Magnet School cannot agree on a pathologist, the Parent shall chose the pathologist and the Board and the Magnet School shall pay for transportation up to a 40 mile round trip limit.

9.    The Board shall reimburse the Parent only for the IEE evaluation performed by Dr. Mayville on or about September 13, 2010 to the extent that the Parent incurred out of pocket expenses. The Parent shall provide the Board with a copy of the receipt or the cancelled check for his out of pocket payment.

(Doc. 19-1 at 19–20, ¶¶ 7–9.) Detailed factual background is set forth immediately below, but generally, Plaintiffs' claims involve allegations that the boards refused to allow the independent consultant sufficient time to properly evaluate Student, failed to properly train school staff and recommend necessary changes to Student's program, failed to timely implement compensatory education, and failed to take seriously Parent's concerns about the safety of transportation arrangements for that compensatory education.

On August 18, 2011, Attorney Shaw filed a letter with CSDE, asserting that the only action the boards had taken was to schedule a PPT for August 24, 2011 and request that an IPP representative attend. (Doc. 41 at 27.) Attorney Shaw asserted that NBBOE and HBOE had therefore "not taken any action to implement the hearing decision since it was issued on August 2, 2011." (*Id.* at 26.)

On August 22, 2011, NBBOE Special Education Coordinator Ann Niedzwiecki provided HBOE with a list of potential independent speech and language service providers who could supply the speech and language compensatory education required by paragraph 8. On August 23, Amy Gates from HBOE emailed Ms. Niedzwicki and indicated that any of the proposed agencies would be fine with HBOE.

A PPT meeting was held on August 24, 2011 for the purpose of "review[ing] the finding of the due process hearing and to plan [Student's] program for next year." (Doc. 41 at 37.) The attorneys for all parties were present. Dr. Zbigniew Golonka from IPP was also in attendance. (*Id.*) According to Dr. Golonka, the only instructions he had received from either of the boards was NBBOE's request that IPP provide a BCBA to work with Student for five hours per week. (Doc. 41-1 at 28.) Dr. Golonka concluded that his responsibility was limited to supervising the BCBA that was assigned by IPP to work with Student. (*Id.*)

Notes from the August 24, 2011 PPT meeting include the following:

Decision based on due process hearing.
1. OT/PT evaluation will be completed by CCMC. [Parent] signed permission to evaluate and release of records.
2. IPP will be contracted for 5 hrs per week to develop FBA/BIP and assist in the development of [Student]'s educational program. [Parent] signed permission to evaluate and release of records.
3. Hartford and NB discussed two possible options for compensatory 180 hrs of Speech and Language services. Talcott Center and Innovative Autism Network are two options. Still need to confirm which company is able to provide these services.

(Doc. 41 at 37.)  The notes also indicate a plan to convene another PPT by the end of September "to review transition to the Slade and to update IEP if necessary." (*Id.*)  As the PPT notes indicate, Parent signed four consent forms on August 24, consenting to evaluation by and release of records to CCMC and IPP. (*Id.* at 39–42.)  He was not, apparently, presented with any consent forms on that date relating to the Talcott Center ("Talcott").

On August 25, 2011, Ms. Niedzwicki informed HBOE that Talcott was chosen to provide the compensatory education.  On August 27, HBOE attorney Melinda Kaufmann suggested that "I think the cleanest way to handle payment for the services is for each board to have a separate contract with Talcott for 90 hours of service.  Transportation will have to involve some type [of] reimbursement if NB is providing it." (Doc. 142 at 33.)  Ms. Niedzwicki replied on August 29: "That does make sense.  As to Transportation—Getting busing for after school hours or Saturday will be a bit of a problem. . . . [D]o you think it would be reasonable to ask [Parent] if we can reimburse him for driving [Student] to his sessions?" (*Id.*)

On September 2, 2011, HBOE Attorney Kaufmann contacted NBBOE Attorney Michael McKeon to find out when speech and language services would be started.  Attorney Kaufmann specifically indicated that:

> School has started and this needs to get in place.  If they are not ready to move on it yet, could you possibly find out [for] me who at the Talcott Center New Britain has been speaking with so that we can at least set up Hartford's contract with them for our portion of the hours?

(Doc. 142 at 35.)  On September 13, 2011, Attorney Kaufmann again emailed Attorney McKeon and stated: "I still need an answer to this.  I do not want my client to be found in violation of the hearing officer's order because the speech language has not been started." (*Id.*)  Attorney

McKeon replied on the same day stating, "The father has still not provided written authorization with respect to sharing information with [Talcott]." (*Id.* at 37.)

On the afternoon of September 14, 2011, Hartford Director for Early Childhood and L5H Services Amy Gates emailed Ms. Niedzwicki to follow up on the speech and language services. (Doc. 142 at 39.) She stated, "As I understand it, each district will be arranging [its] own procedure for payment of the 90 hours, correct? Have you decided to go with Talcott and how have you arranged the services." (*Id.*) Ms. Niedzwiecki replied by email that day stating:

> We have decided to go with Talcott. I had to do a bid waiver for the board which just got approved. HOWEVER [Parent] has not signed a release for us [to] release records. Busing will be an issue. But I am hoping that [Parent] will agree to transport [Student] and we will cover transportation cost."

(*Id.*) Later that evening, Ms. Niedzwiecki emailed Parent (cc'ing Attorneys Shaw and McKeon) stating, "[T]his is a reminder that we still have not received the signed consent for Talcott Center. We can not begin arranging services until we have the signed consent. This consent was mailed to you the first week in September." (Doc. 131-8 at 41.)

A PPT meeting was held on September 23, 2011 to revise Student's IEP. (*See* Doc. 41-1 at 2.) HBOE was not invited and did not attend the meeting, but Dr. Golonka from IPP was present. The "meeting summary" includes the following notations:

> Consent signed for release of information between this school and the outside agency from which [Student] will be receiving speech and language services: 9/23/11. . . .

> Discussion regarding IPP consult services occurred. IPP suggested that need to have hours front-loaded, with hours being decreased after the BIP is in place and staff is trained. Due process decision stated Five hours per week, Both [Parent] and New Britain will contact their attorney to determine whether we can modify these hours.

(Doc. 41-1 at 3.) In an email dated September 29, 2011, Ms. Niedzwiecki stated to Ms. Gates that Parent "just signed permission to share information with Talcott Center." (Doc. 142 at 42.)

On October 4, 2011, Ms. Niedzwiecki wrote to Ms. Gates that "Talcott Center is contacting [Parent] to arrange a schedule. Hopefully this will be done shortly. We will have to work on transportation." (*Id.* at 41.) On October 7, 2011, Ms. Gates corresponded with Kimberly Bengtson from Talcott regarding the contract for Talcott's services with HBOE. On October 20, 2011, Talcott contacted Parent to set up times for the speech and language services. (*Id.* at 45.) Parent called Ms. Bengtson back and left a message stating that transportation needed to be worked out and that he would get back to her. (*See id.*)

On October 31, 2011, Attorney Kaufmann emailed Attorney McKeon stating, "Any idea what the true story is behind the speech services. I thought this was being implemented." (*Id.* at 49.) As of November 9, Parent had still not contacted Ms. Bengtson. (*See id.* at 45.) Parent contends, however, that he was waiting for Ms. Niedzwiecki to get back to him regarding transportation for Student. (Doc. 41-1 at 53.) Attorney Shaw emailed Attorney McKeon on November 9, 2011 asserting that "New Britain is going to have to work out the transportation related to the compensatory education. Niedzweicki cannot insist that the parent provide this educationally related transportation. . . . [Parent] has been waiting for New Britain to provide the necessary transportation." (*Id.* at 52–53.)

Meanwhile, in a letter to Parent dated October 25, 2011 regarding IPP, NBBOE stated: "[W]e are required to provide 5 hours per week for this school year. According to our school calendar we are in session for 37 weeks. Thus we are responsible for contracting 185 hours (37 x 5) with IPP. We will not exceed this amount of time." (Doc. 33-4 at 3.) The letter also stated that it was Parent's decision "whether you want IPP to upfront their hours at this time of the year and decrease them later in the school year. Until I hear from you regarding how you want to proceed, we will continue to have IPP provide services 5 hours per week." (*Id.*)

On October 28, 2011, Attorney Shaw again wrote to CSDE, asserting that NBBOE and HBOE were still "not in compliance" with the hearing decision. (Doc. 41-1 at 37.)  He asserted that the boards had: (1) limited IPP to a total of five hours per week, which was insufficient and inconsistent with paragraph 7(a) of the hearing decision; (2) selected a provider for compensatory education under paragraph 8, but insisted that Parent provide transportation, which Parent could not provide; and (3) refused paragraph 9's requirement to reimburse Parent for the IEE performed by Dr. Mayville, on the grounds that Parent could not produce proof that he paid for the evaluation, despite the fact that Parent could not afford to pay Dr. Mayville because Parent is indigent. (*Id.* at 37–38.)

In a letter dated November 1, 2011, CSDE acknowledged receipt of Attorney Shaw's October 28 letter, stated that the issues raised in that letter would be "processed by this office as a state complaint pursuant to the complaint resolution process," and assigned complaint number 12-0153. (Doc. 41-1 at 41.)[17]  On November 7, 2011, Plaintiffs filed their Counterclaim in this court action, asserting that, since the hearing decision, NBBOE and HBOE had "failed and refused to implement the hearing decision." (Doc. 25 at 16, ¶ 7.)  On November 8, 2011, CSDE Education Consultant Attorney Gail Mangs wrote to the parties requesting detailed written responses to the issues. (Doc. 41-1 at 47.)  The letter identified the issues as alleged failures to comply with paragraphs 7, 8, and 9 of the hearing decision due to the boards': (1) limiting the PPT consultant's time to five hours per week; (2) insistence that Parent provide transportation to compensatory education; and (3) refusal to reimburse Parent for Dr. Mayville's independent educational evaluation. (*Id.*)

---

[17] CSDE's procedures for the CRP appear in the record at Document 222-1.

In a letter and email dated November 9, 2011 and addressed to Parent (and copied to

Attorney Shaw), Ms. Niedzwiecki stated:

> I just got off the phone with Kim from the Talcott Center. She reported
> that she called you on 10/20/11 and left a message about possible times for speech
> language sessions for [Student]. She did say that you called her back and left a
> message that transportation needed to be worked out and you would get back to
> her. Since that time, she has not heard back from you. On 10/24/11 Kim left
> another message with you asking that you call so that they could begin therapy
> sessions. She also left a message on 11/7/11.
>
> You have not contacted us regarding the times that were offered by the
> Talcott Center. At [Student]'s last PPT I indicated that we coul[d] not arrange
> transportation until we had dates and times of the sessions. Once I get that
> information from you, we can work out the transportation.
>
> Kim indicated that she has the following times and days available for
> [Student]'s sessions: Mondays 5:00-6:30 pm and Wednesdays 4:00-6:00 pm. We
> need to know that these times are agreeable to you.
>
> When you confirm that these times work for you, we will arrange
> transportation. I have left a message on your phone for you to call me to discuss
> this issue.
>
> A copy of this email will also be sent U.S. mail.

(Doc. 131-8 at 50, 53.) Parent subsequently contacted Ms. Niedzwiecki and confirmed a

schedule. The compensatory speech and language services required by paragraph 8 of the

hearing decision commenced with Talcott on November 14, 2011. (Doc. 41-2 at 4.)

That did not, however, end the disputes related to paragraph 8. Attorney Shaw emailed

the attorneys for HBOE and NBBOE on November 16, 2011, relaying Parent's concern that the

arranged transportation provider dropped Student off in front of the Talcott building with no

supervision, and that Student was not capable of safely finding his way into the building, to his

therapist, and back without supervision. (*See* Doc. 41-1 at 58.) The email asserted that when

Parent reported his concerns to Ms. Niedzwiecki, she responded that, if Parent was so concerned,

he could follow Student during the trip to and from the Talcott Center. (*Id.*) Attorney Shaw

asserted that that was not a responsible solution, and requested a PPT to deal with the issue. (*Id.*)

On November 22, 2011, Attorney McKeon replied by email (cc'ing Attorney Kaufmann),

stating:

> [Student] is transported by van to the Talcott Center. When the van is a few miles
> from the Center, the van driver calls the Center, and [Student]'s speech and
> language pathologist comes out to meet the van and walk [Student] into the
> Center. This is reversed when [Student] leaves, with his pathologist walking
> [Student] to the van.

(Doc. 41-1 at 60.) Attorney Shaw responded later that day, stating: "We better have a PPT

meeting as it appears as though the driver does not call ahead and the therapists do not come out

to escort [Student], leaving him to find his way into the therapy sessions from the parking lot."

(*Id.*) According to Parent, he followed the van to Talcott on several occasions "only to find that

my son was still being dropped off in the parking lot and no arrangements had been made to

ensure his safe arrival into The Talcott Center." (*Id.* at 64.)

Attorneys Kaufmann and McKeon responded to CSDE's November 8, 2011 request in

letters dated December 5, 2011 and December 23, 2011, respectively. (Doc. 41-2 at 2–4; 38–

41.) A PPT meeting was held on December 8, 2011, at which Attorney Kaufmann and McKeon

were present. (*See* Doc. 41-2 at 22.) Parent presented a list of concerns, which included his

assertion that he was "very concerned regarding [Student]'s safety when going to Talcott Center

himself." (*Id.* at 28.) The PPT summary includes a notation that each of Parent's concerns "was

addressed by the team." (*Id.* at 23.) Parent asserts, however, that at the PPT meeting Attorney

McKeon told him that his concerns "were not taken seriously because [Parent] had no

credibility." (Doc. 41-1 at 64.) According to Parent, Attorney McKeon made that statement "in

the presence of all the members of the PPT," who "sat silently" and who never told Parent that

they would look into his safety concerns to determine if they were valid. (Doc. 178 at 5.)[18]

Dr. Golonka was also present at the December 8, 2011 PPT meeting. (Doc. 41-2 at 22.)

IPP had been providing services since August. By letter dated November 4, 2011 and addressed

to NBBOE Director of Pupil Services Dr. Elizabeth Ann Carabillo, Dr. Golonka had stated:

> I need clarification on item 7a of the Final Decision and Order 11-0154. Based on my initial observations in the Student's current placement, the review of behavioral data collected by the school staff, and the Functional Behavioral Assessment completed and presented at the PPT on 09/23/2011, it seems that in order to consult with ". . . the PPT in developing and implementing appropriate education for the Student" (item 7a, page 19 of the Final decision), I need to have access to the Student and his team members. The item 7a does not order or suggest any number of hours or a time frame to complete my work. As presented in item 7c, which requires the presence of a BCBA 5 hours per week, it appears to me that item 7a is a separate order from item 7c. Similarly, I understand that item 7b, "The program will be at the Board's Middle School," is separate from item 7a and 7c. It seems to me that item 7 includes three different orders and, at the current moment, the Board is addressing items 7b and 7c, but not item 7a. Please help me in clarifying this issue.

(Doc. 183 at 35.) Dr. Carabillo replied by letter dated November 30, 2011, stating that:

> You personally have had the opportunity of observing and interacting with both the Student (during school) and consults with the team at 2 PPT meetings (August 24, 2011 and September 23, 2011). A third PPT meeting is being held on December 8, 2011 and you have been invited to attend. Your colleague, Allison Snelling, has also observed the Student and has participated in the September 23, 2011 PPT and was invited to the December 8, 2011 PPT. You have consulted with the team in developing and implementing an appropriate special education program for the Student. . . .
>      You have had access to the Student and the staff in consult to developing and implementing the appropriate special education program for the Student and [IPP] has the obligation of working with the Student for 5 hours every week.

---

[18] Attorney McKeon states in an August 29, 2014 affidavit that he never advised Parent that NBBOE would dismiss Parent's concerns because of a lack of credibility. (Doc. 183 at 118.) According to Attorney McKeon, he did state in an exchange with Attorney Shaw (but not Parent) that Parent's assertions "had not always been supported by the facts, and given the consequent effect upon his credibility, New Britain could simply not accept it as true without fully considering and discussing his concerns, as it always did, in order to ascertain whether what he claimed to be the case, was, in fact, the case." (*Id.*)

(*Id.* at 36.)

Dr. Golonka believed that the five hours of consulting time specified by paragraph 7(c) of the hearing decision was "not sufficient for IPP to provide consultation to the PPT relating to the development and implementation of the IEP as specified in paragraph 7.a." (Doc. 41-1 at 29.) At that December 8, 2011 PPT meeting, Dr. Golonka says that Attorney McKeon and Ms. Niedzwiecki "repeatedly indicated that IPP would be limited to 5 hours per week of consultation by a BCBA" and that "no additional consulting time would be permitted to help the PPT develop and implement an appropriate IEP." (*Id.* at 30.)

After the December 8, 2011 PPT meeting, Attorney Shaw emailed Attorney McKeon stating: "I understand from the PPT meeting today that the Board will be providing [Parent] and me with a letter from the Talcott Center confirming that they are escorting [Student] from the van into the Talcott Center and from the Talcott Center to the van after the speech and language therapy." (Doc. 142-1 at 12.) On December 9, 2011, Parent requested that Talcott provide documentation confirming the arrangements made by NBBOE to ensure the safe drop off and pick up of Student at Talcott. (Doc. 41-2 at 33.)

Talcott wrote two letters on the issue.  In a letter dated December 19, 2011 and addressed to Ms. Niedzwiecki, Talcott stated:

> [T]he following procedures are in place.  Town and Country is to call our clinic upon [Student]'s arrival on the van.  An available administrator or clinician then proceeds out to the van and escorts [Student] into the clinic.  This information is then documented into [Student]'s file.  Upon departure, and administrator or clinician will walk [Student] out of the office and escort him onto the van.

(Doc. 131-8 at 61.) As of June 15, 2012, Attorney Shaw had not received a copy of that letter. (Doc. 41 at 32.) Talcott also replied to Parent's December 9, 2011 letter with its own letter dated January 4, 2012, stating:

- Our records indicate that Kimberly Bengtson, our Administrative Director, phoned Town and Country on November 22 and spoke with Angela. Mrs. [Bengtson] shared with Angela that the Town and Country driver was to call our office and let us know when the client is outside. As of 11/22/2011, no calls had been made to our clinic. Angela shared she would look into this.
- On November 28, 2011, Town and Country did call our clinic to share that they were in the parking lot. Mrs. Bengtson went out to the parking lot to escort [Student] off of the van.
- On December 8, 2011, Mrs. Bengtson confirmed with both [Parent] and NB public schools that to date, only one phone call has been made to The Talcott Center by Town and Country, to confirm [Student]'s arrival.

(Doc. 41-2 at 34.)

Meanwhile, on December 27, 2011, Attorney Mangs issued findings of fact and conclusions. (Doc. 41-2 at 46–48.) She concluded that there was no violation of paragraph 9, since the hearing order "clearly and unambiguously states that reimbursement for the IEE is to be made to the parent, but only to the extent that the parent incurred out of pocket expenses (which he apparently has not)." (*Id.* at 48.) She also concluded, however, that NBBOE was in violation of paragraph 7, since the 5-hour limitation in paragraph 7 applied only to the BCBA's work with Student, and not to IPP's required consultative services. (*Id.* at 47.) Attorney Mangs also found that the transportation issue in paragraph 8 continued to be an issue. (*Id.* at 48.) She required two corrective actions:

1. On or before January 23, 2012, representatives of the parent and the New Britain and Hartford Public Schools shall meet with representatives of IPP in a duly noticed PPT meeting to determine the number of hours IPP expects they will require to fulfill the Hearing Officer's Order . . . . Documentation of this meeting, which shall include the determinations that result from the meeting and which shall be in the form of an IEP, shall be provided to this office for review within 5 business days of the meeting.

2. At the PPT meeting set forth above, the transportation issue shall be resolved with the resolution set forth in the IEP. All parties, including representatives of IPP and the Talcott Center (who may participate by telephone, if necessary, during the portion of the meeting that involves the transportation issue) shall assist in developing an appropriate transportation plan which, if necessary, may include different service days, a transportation aide or additional

services from Talcott Center personnel to ensure that the student receives all of the required speech and language services hours. As above, the resolution will be reviewed by this office.

(*Id.*)

On January 9, 2012, Attorney McKeon emailed Attorneys Kaufmann and Shaw, stating that NBBOE could offer PPT meetings on January 18, 25, or 31. (Doc. 142-1 at 20.) Attorney Kaufmann replied to remind Attorney McKeon that the PPT had to be held on or before January 23, 2012. (*Id.*) On January 23, 2012, Attorney Kaufmann contacted Attorneys McKeon and Shaw to find out if the PPT had been scheduled yet, and learned that Attorney Shaw was checking with his client about available dates. (*Id.* at 21.)

In a letter to Attorney Mangs dated January 24, 2012, Attorney Shaw noted that no PPT had been held due to scheduling problems, and asserted that the boards were still not in compliance. (Doc. 41-2 at 62–66.) Attorney Shaw asserted three categories of noncompliance: (1) failure to provide 180 hours of compensatory speech and language services; (2) failure to provide occupational and physical therapy services as ordered; and (3) failure to authorize the independent consultant to spend the time necessary to develop an appropriate program. (*Id.*) In a letter to Attorney Mangs dated February 16, 2012, Attorney Shaw reported that a PPT was held on February 7, 2012, but that there was still no resolution of the issues raised in his January 24, 2012 letter. (Doc. 41-3 at 18–19.)

Dr. Golonka was present at the February 7 PPT. (*Id.* at 2.) Counsel for all parties were also present. (*Id.* at 18.) The minutes from the February 7 meeting indicate that IPP presented to the PPT "[a] summary of progress with accompanying recommendations." (*Id.* at 5.) The minutes also state that "[t]he attorneys agreed to discuss the issue of compensatory SL services and transportation outside of the PPT." (*Id.*) According to Dr. Golonka, the first time the PPT

authorized IPP to consult with respect to the development and implementation of the IEP was at the February 7 PPT meeting. (Doc. 41-1 at 30.) Also according to Dr. Golonka, the NBBOE representatives at the PPT meeting never asked IPP how many hours of consulting time would be necessary to implement paragraph 7(a). (*Id.*)

According to Attorney Shaw's February 16, 2012 letter, the February 7 PPT "agreed to allow the consultant to expand his role beyond behavior management to encompass implementation of all aspects of the IEP" and "agreed to authorize Dr. Golonka to spend sufficient time to enable him to help the PPT develop and implement the IEP as required by paragraph 7.a. of the Hearing Officer's Order." (Doc. 41-3 at 19.) However, Attorney Shaw noted that "neither agreement is documented in the IEP" and Plaintiffs therefore had "no assurance" that the agreements would be implemented. (*Id.*) Finally, Attorney Shaw noted that NBBOE denied his request that Dr. Golonka be authorized to spend one full year of consulting. (*Id.*)

On February 10, 2012, Attorney Shaw wrote to Attorneys McKeon and Kaufmann indicating that one particular problem with the transportation services was due to an error that Talcott made in its speech schedule for Student. (*See* Doc. 142-1 at 33.) By letter dated February 16, 2012 and addressed to Attorney Mangs, Attorney Shaw requested that speech services "be extended through 2012 ESY [summer] and 2012–2013 school year," as he believed that with the current schedule Student would not receive the entire 180 hours ordered within the school year. Attorney Shaw also requested that the services be provided "within the New Britain Public School that the student attends." (*Id.* at 35–36.)

A PPT was held on March 5, 2012; Dr. Golonka and Attorney Shaw were both in attendance. (*See* Doc. 121-2 at 8.) Based on his review of information and records and

observations of Student at home and in school, Dr. Golonka provided a written list of

recommendations for the PPT's consideration. (*Id.* at 37–38.) Dr. Golonka recommended

intensive parent training, specific curricula, and a BCBA for the 2012–2013 school year. (*Id.*)

The IPP rejected Dr. Golonka's recommendation for in-home parent training because "no data"

supported the conclusion that Student's "home behaviors impact his school functioning." (*Id.*

at 10.) According to Dr. Golonka, the PPT also rejected his recommendation for a BCBA for the

2012–2013 school year. (Doc. 41-1 at 30–31.) Also according to Dr. Golonka, the NBBOE

representatives at the PPT never asked IPP how many hours of time would be necessary to

implement paragraph 7(a). (*Id.* at 30.) IPP continued providing services through the end of the

2012 school year (for a total of 208.75 hours, according to billing records), but there is no

evidence that NBBOE retained IPP after that for any purpose. (*See* Doc. 183 at 108.)

On March 15, 2012, Attorney Shaw emailed Attorneys Mangs, McKeon, and Kaufmann,

asserting that the boards had provided inadequate and unreliable transportation services, and had

prohibited Parent from communicating with the transportation provider. (Doc. 142-1 at 37.) He

stated that, as a result, it had taken almost seven months to arrange the services with Talcott. He

then noted that Parent had been informed on March 15 that the boards had terminated the

services with Talcott, without being consulted and without informing him how the services

would be delivered in the future. (*See id.*) Attorney Kaufmann forwarded Attorney Shaw's

March 15 email to Attorney McKeon stating: "Any idea what this is about?  Hartford certainly

did not act to terminate any services?" (*Id.* at 38.)

On April 5, 2012, Ms. Niedzwicki emailed Attorney Kaufmann stating "I just want to

give you a heads up that our 90 hours of SL services for [Student] is up next week.  We have

changed services providers to an SLP from CREC [Capitol Region Education Council] TABS

which is working out much better since she comes in at 3:00—so transportation is not an issue anymore." (*Id.* at 40.) Also on April 5, Attorney McKeon emailed Attorney Kaufmann stating that "Hartford's turn at the speech-and-language plate is fast approaching." (*Id.* at 42.) The email included calculations stating that Talcott had provided 71 hours of services, and that by Wednesday April 11 CREC would have provided 19 hours. (*See id.*)

In a letter dated April 5, 2012, Attorney Shaw wrote to Attorney Mangs requesting an update on the complaint processing. In a footnote, Attorney Shaw stated:

> With regard to the 180 hours of compensatory speech and language services, the Board has agreed with the Parent's request to arrange to have speech and language services provided in the Slade Middle School by a therapist from CREC, and to continue the therapy during the 2012 ESY and 2012–2013 school year to ensure that the 180 hours are fully implemented. Although we have disagreed with the manner in which the Board terminated its contract for these services with the Talcott Center and arranged therapy through CREC without discussing the change with the Parent or at a PPT meeting, we are willing to accept the Board's unilateral changes provided it is clear that the full 180 hours of speech and language services will be provided.

(*Id.* at 43.) Attorney Kaufmann wrote to Attorney Mangs in a five-page letter dated April 9, 2012, asserting that there was no evidence that HBOE was in violation of the hearing decision. (*See id.* at 45–50.)

In an email dated April 24, 2012, Attorney Mangs wrote:

> Corrective Action No. 1 has not been completed. The IEPs provided do not indicate that this issue was discussed or, that even if discussed, there was any conclusion regarding the number of hours IPP expects they will need to fulfill the Hearing Officer's Order. Regarding Corrective Action No. 2, The Student is now receiving speech and language services in his school so that transportation is no longer an issue; the Parent is requesting reimbursement for transporting and/or accompanying the Student to the Talcott Center due to parent concerns about safety.

> Please note that complaints regarding an allegation that a hearing officer's order is not being implemented do not allow the investigator to create new orders that would result in corrective action that move completely beyond the original order. Therefore, transportation reimbursement would not be ordered. In addition, the

Parent's request for compensatory education for failing to conduct evaluations promptly would not be ordered; in addition, although it is expected that the evaluations would be completed in a reasonable amount of time, the hearing officer did not set any particular requirements for when the evaluations were to be completed.

(Doc. 41-3 at 75–76.) Attorney Mangs instructed the parties to complete and document compliance with Corrective Action No. 1 either by agreement or by convening a PPT on or before May 7, 2012. (*Id.* at 76.)

In her email, Attorney Mangs remarked that "the normal procedure followed when corrective actions issued through the Complaint Resolution Process are not completed as ordered is to refer the issue to the Attorney General's Office." (*Id.*) However, Attorney Mangs also observed that, since the hearing officer's decision was being appealed, "it is expected that the Parent will notify this office as to whether failure to complete the corrective actions will be addressed through the appeal or should be sent to the Attorney General's office." (*Id.*)

On May 7, 2012, HBOE informed Attorney Mangs that HBOE had contracted with CREC to provide the remaining 90 hours of speech and language services and that it would continue to provide those services over the summer and into the 2012–2013 school year, if necessary to complete the hours. (*See* Doc. 142-1 at 63.) On May 8, 2012, Attorney Mangs contacted the parties stating that "I have still not heard about Corrective Action No. 1 regarding the IPP hours. Please provide a response." (*Id.*) Attorney Kaufmann replied on May 9, asserting that HBOE had no obligations relative to the IPP hours, and thus had taken no further action. (*Id.*)

In an email reply dated May 9, 2012, Attorney Shaw asserted that the boards had still not complied with Corrective Action No. 1 because they had still not held a PPT on that issue. (Doc. 41-3 at 74.) Attorney Mangs replied: "If the Boards do not intend to address corrective action

no. 1, the matter will be referred to the Attorney General's office for action." (*Id.*) HBOE

commenced providing Student with speech and language services on May 16, 2012, and

provided transportation for Student from his school to his home at the end of the session. On

August 27, 2012, HBOE sent Attorneys Mangs and Shaw documentation of the completed

91 hours of speech and language therapy between May 16, 2012 and August 21, 2012. (Doc.

142-2 at 30.)

It appears that the matter of Corrective Action No. 1 was referred to the Attorney

General's Office, although it is unclear what action that office took other than writing a letter

dated December 13, 2012. (*See* Doc. 222-5 at 2.) The action appears to have subsequently

shifted primarily to this court case. Plaintiffs filed their Amended Counterclaim on

September 10, 2012. (Doc. 67.) HBOE moved to dismiss the counterclaims, asserting, among

other things, failure to exhaust administrative remedies. (Doc. 70.)

In its October 8, 2013 decision, the court denied HBOE's motion to dismiss the Amended

Counterclaims (except as to the claims concerning punitive damages). *A. ex rel. A. v. Hartford

Bd. of Educ.*, 976 F. Supp. 2d 164, 198 (D. Conn. 2013). In that decision, the court reasoned that

IDEA's exhaustion requirement, 20 U.S.C. § 1415(i)(2)(A),[19] did not bar Plaintiffs'

counterclaims "because Plaintiffs did not *bring* the lawsuit pursuant to which they filed the

counterclaims." *A. ex rel. A.*, 976 F. Supp. 2d at 181. The court further noted that HBOE had

"not addressed in any specificity how Plaintiffs ought to have exhausted such a requirement" and

that HBOE had "not addressed whether the review Plaintiffs sought and received by [CSDE] was

---

[19] Section 1415(i)(2)(A) "provides a cause of action to those parties who are 'aggrieved' by a 'final' decision of either an impartial due process hearing officer, if the state does not have an appeals process, or the state educational process, if it does." *A. ex rel. A.*, 976 F. Supp. 2d at 181 (quoting *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 203 (2d Cir. 2007)).

sufficient in this regard." *Id.* The court further concluded that, in any case, it was unnecessary to decide whether Plaintiffs had exhausted their administrative remedies because the futility exception to the general exhaustion rule applied in Plaintiffs' case. *Id.* at 182–84. The court reasoned as follows:

> Given Defendants' alleged lack of action in the face of clear instructions contained in both the Hearing Officer's decision *and* the subsequent emails sent by the Connecticut Department of Education pursuant to its Complaint Resolution Process which explicitly stated that Defendants *must* comply with certain aspects of the Hearing Officer's decision with which they allegedly thus far had not complied, the Court, in evaluating the assertions and facts under the standards required for a motion to dismiss, finds it highly plausible that further administrative review would not further any of the goals identified by the Second Circuit over the past several decades. Along the same logical rubric, given Defendants' allegedly repeated and, moreover, allegedly advertent non-compliance with these decisions, it also seems to this Court that requiring further administrative review *by the very same entities whose prior directives and resolutions were allegedly ignored by Defendants* would be futile, as these entities' lack of power to enforce such directives and resolution (and Defendants' alleged unwillingness to fully follow or comply with them) has been sufficiently asserted and demonstrated in the record under the standards by which this Court must now view and evaluate them.

*Id.* at 184. Litigation in this case has continued since then.

In a letter dated January 20, 2015, CSDE Educational Consultant Mary Jean Schierberl wrote to the parties regarding complaint No. 12-0153 stating: "This office is in receipt of documentation that New Britain and Hartford Public Schools have complied with the Required Corrective Actions issued in the above-referenced complaint report. Accordingly the complaint is closed." (Doc. 222-5 at 4.) Attorney Shaw responded by letter dated February 1, 2015, requesting that CSDE "reconsider and reverse this decision in light of the fact that CSDE's conclusion is not supported by the record and because this precipitous reversal of CSDE's position in the case violates my clients' rights . . . ." (*Id.* at 1.)

Ms. Schierberl replied by letter dated February 18, 2015, announcing that she took the initiative to conduct a review of Student's file on-site at the NBBOE office "[b]ecause of the long-standing open status of the complaint, and [CSDE's] obligation to take steps necessary to achieve compliance where noncompliance is verified." (Doc. 222-3 at 1.) She stated that she reached her conclusion to close the complaint based on her review of paperwork from the August 24, 2011 PPT meeting, which had not been submitted to Attorney Mangs during the complaint investigation. (*Id.* at 1–2.) According to Ms. Schierberl, the documents showed that the PPT met to review the finding of the due process hearing, and that the team recommended that IPP would be contracted for five hours per week. (*Id.* at 2.) The February 18, 2015 letter concludes:

> I am not inclined to re-open the complaint. However, in fairness, I did not inform you of the basis for my decision. For this reason, I will provide you with the opportunity to respond to this letter and my conclusion that the outstanding required corrective action issued in the complaint report has been complied with.

(*Id.*)

Attorney Shaw replied by letter dated February 24, 2015. (Doc. 222-2.) He asserted that, in light of the pending litigation in court, CSDE lacked jurisdiction to take actions that might interfere with the court case. (*Id.* at 2.) Attorney Shaw also argued that there was no procedural authority for CSDE to conduct an unannounced review and to reverse the decision of an assigned consultant. (*Id.*) Finally, Attorney Shaw argued that there was no basis for reconsideration and reversal of Attorney Mangs's 2012 verification of noncompliance. (*Id.* at 3.) He asserted, among other things, that the August 24, 2011 PPT could not have resolved the compliance issue because it occurred *before* the September 23, 2011 PPT, at which NBBOE stated that it would not authorize IPP to consult with the PPT, and that it would only fund five hours per week of

BCBA time. (*Id.* at 4.) Attorney Shaw represents that, as of May 5, 2016, CSDE had not responded to his February 24, 2015 letter. (Doc. 232-1 at 10.)

**B.      Effect of Recent CSDE Action**

NBBOE argues that CSDE's "official findings vindicating New Britain lead to the inescapable conclusion that the plaintiffs' claims are . . . illusory." (Doc. 229 at 5.) NBBOE asserts that Plaintiffs "essentially propose that this court ignore [CSDE]'s February 18, 2015 correspondence and that it instead proceed under the fiction that [CSDE] actually found in the plaintiffs' favor and not in New Britain's." (*Id.*) According to NBBOE, "[s]uch an unorthodox suggestion finds no support in any legal or procedural authority of which New Britain is aware, but it underscores the chimerical nature of the plaintiffs' contentions against it." (*Id.*) Plaintiffs maintain that CSDE's February 18, 2015 letter should not be afforded any collateral estoppel effect. (Doc. 232-1 at 3.) Plaintiffs also contend that the law-of-the-case doctrine forecloses NBBOE's suggestion that Plaintiffs must re-exhaust the CRP. (*Id.* at 10.)

CSDE's February 18, 2015 letter does not preclude Plaintiffs' ADA, § 504, and § 1983 claims. Initially, since CSDE has not responded to Attorney Shaw's February 24, 2015 letter (which essentially seeks reconsideration of CSDE's position), it is unclear whether the proceedings before the CSDE have been "fully" litigated for the purposes of any preclusion doctrine. *See Ventres v. Goodspeed Airport, LLC*, 21 A.3d 709, 717 (Conn. 2011). In any case, this court explicitly held in its October 8, 2013 decision that further administrative review would be "futile," and resolved to adjudicate Plaintiffs' claims relating to compliance with the hearing decision—including the claims that were before the CSDE. *A. ex rel. A.*, 976 F. Supp. 2d at 184. Having assumed jurisdiction over those claims, the court cannot conclude that CSDE's February 18, 2015 letter could have any impact on the court's authority or ability to adjudicate

49

them.  Neither is there any basis to require Plaintiffs to re-exhaust the CRP—as the court

previously concluded, exceptions to the exhaustion rule apply.  *Id.* at 182.

### C.    Plaintiffs' ADA, § 504, and § 1983 Claims

All parties seek summary judgment on Plaintiffs' ADA, § 504, and § 1983 claims.  (*See*

Doc. 126-1 at 68; Doc. 136 at 49; Doc. 152 at 5, 29.)  As discussed above, shortly after the

August 18, 2011 hearing decision was issued, Plaintiffs asserted in both the CRP and in this

court that NBBOE and HBOE were not in compliance with the hearing decision.  In their

Amended Counterclaim, Plaintiffs claim that the boards failed and refused to implement the

hearing decision and interfered with implementation by failing to: (1) "allow[] the independent

consultant sufficient time to properly evaluate the Student"; (2) "properly train school staff and

recommend necessary changes to the program"; and (3) "implement critical relief ordered by the

hearing officer such as the compensatory education instruction required by the Order, refusal to

pay for the Parent's independent evaluation[,] and refusal to pay for transportation related to the

evaluations."  (Doc. 67 at 18–19.)  Plaintiffs assert that they have produced documentation

supporting those allegations.  (Doc. 126-1 at 69.)  NBBOE and HBOE both contend that there is

no factual or legal basis for Plaintiffs' counterclaims.  (*See* Doc. 136 at 49; Doc. 152 at 2.)

### 1.    Count 1: ADA and § 504 Claims (Plaintiffs' "Interference" Claims)

The court begins by briefly recapitulating the law of the ADA and § 504.  The court then

turns to each of the parties' arguments.

In its October 8, 2013 decision, the court described the relevant law of the ADA and

§ 504.  *See A. ex rel. A.*, 976 F. Supp. 2d at 188–94.  Both § 504 of the Rehabilitation Act and

Title II of the ADA "offer essentially the same protections for people with disabilities."  *Id.*

at 189 (quoting *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 113 (2d Cir.

2001)).  Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Under both the ADA and § 504, "the denial of a FAPE to a disabled student can constitute covered disability discrimination."  *A. ex rel. A.*, 976 F. Supp. 2d at 190 (quoting *Brennan v. Reg'l Sch. Dist. No. Bd. of Educ.*, 531 F. Supp. 2d 245, 278–80 (D. Conn. 2008)).  Although there is overlap between the IDEA, § 504, and the ADA, there is at least one important difference between the IDEA and the other two statutes: § 504 and the ADA "only remed[y] acts of *intentional* discrimination against the disabled."  *Id.* (alteration in original) (quoting *Brennan*, 531 F. Supp. 2d at 279).  Thus, Plaintiffs must present evidence that Defendants were "at minimum[] deliberately indifferent to a strong likelihood that [Student's] federal rights would be violated."  *Id.* (alterations in original) (quoting *Brennan*, 531 F. Supp. 2d at 279).

The elements for prima facie claims under § 504 and the ADA are nearly identical; the statutes require plaintiffs to show: (1) that they are "qualified individuals" with a disability; (2) that the defendants are subject to the ADA or § 504; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants "by reason of" such disabilities (for ADA claims) or "solely by reason of" the disabilities (for § 504 claims).  *A. ex rel. A.*, 976 F. Supp. 2d at 190.

At the motion-to-dismiss stage of this case, Plaintiffs clarified that they are not asserting "basic discrimination" or "retaliation" claims under the ADA or § 504. *See id.* at 191–92.[20] Instead, Plaintiffs claim that "by refusing to implement the order of the administrative hearing officer the Defendants *interfered* with . . . Plaintiffs' rights secured by . . . 42 U.S.C. § 12203(b) and [Section] 504." (Doc. 77 at 51 (emphasis added).) Section 12203(b) of Title 42 provides (with emphasis added):

> It shall be unlawful to coerce, intimidate, threaten, or *interfere* with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

Section 504 includes essentially the same protections, since 29 U.S.C. § 794a incorporates the remedies, procedures, and rights in Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.),[21] and since the regulations implementing Title VI state, in pertinent part:

> No recipient or other person shall intimidate, threaten, coerce, or *discriminate against any individual for the purpose of interfering* with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

34 C.F.R. § 100.7(e) (emphasis added).  The court previously held that Plaintiffs had stated a plausible interference claim under both the ADA and § 504. *A. ex rel. A.*, 976 F. Supp. 2d at 193–94.

---

[20] Plaintiffs reaffirm that position at the summary judgment stage. (*See* Doc. 169 at 47 ("Plaintiffs argue that Defendants 'interfered' with implementation of the Plaintiffs' federal IDEA rights, not that NBBOE retaliated against Plaintiffs.").)  It is therefore unnecessary to address NBBOE's argument regarding any retaliation claim under the ADA or § 504. (*See* Doc. 136 at 52–53.)

[21] Section 2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

### a.      Private Right of Action Under § 504 for "Interference"

HBOE contends that Plaintiffs' interference claim under § 504 fails because 34 C.F.R.

§ 100.7(e) does not create a private right of action. (Doc. 152 at 8.)  The court concludes that

*Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), controls on this issue.  It is

unnecessary to decide whether § 100.7(e) could or does create a private right of action because

the statute it implements—42 U.S.C. § 2000d—"contains the necessary prohibition." *Jackson*,

544 U.S. at 178.  In *Jackson*, the Supreme Court held that Title IX's private right of action

"encompasses suits for retaliation, because retaliation falls within the statute's prohibition of

intentional discrimination on the basis of sex." *Id.*  Similar reasoning applies here:

section 2000d's private right of action[22] encompasses suits for interference because interference

comes within § 2000d's prohibition on discrimination.  Since § 2000d includes that right,

section 504 does, too. *See* 29 U.S.C. § 794a(a)(2).

### b.      Exhaustion

NBBOE asserts that Plaintiffs seek to use the ADA and § 504 "as a means of avoiding

another due process hearing" and that "the appropriate avenue is [for Plaintiffs] to avail

themselves of the special education hearing process provided for under both federal and

Connecticut law." (Doc. 136 at 53–54.)  The court rejects that argument because it has already

determined that further attempts to exhaust administrative remedies would be futile. *A. ex rel.*

*A.*, 976 F. Supp. 2d at 184.

### c.      Interference By Reason of Disability

As in the motion-to-dismiss stage of this case, there is no dispute that Student is a

"qualified individual" under the first prong of the tests for § 504 and ADA claims, or that the

---

[22] Although Title VI does not mention a private right of action, it is judicially implied.
*See Barnes v. Gorman*, 536 U.S. 181, 185 (2002).

defendants are subject to the ADA and § 504 under the second prong.  Defendants' remaining

arguments relate to the third prong: discrimination (or interference) "by reason of" disabilities or

"solely by reason of" disabilities.  NBBOE and HBOE both argue that there was no interference

because they each fully implemented the hearing decision.  (Doc. 136 at 54; Doc. 152 at 14.)

The boards also contend that Plaintiffs have adduced no evidence to support the requisite mental

state. (Doc. 136 at 52; Doc. 152 at 21.)[23]  Finally, NBBOE asserts that Plaintiffs have advanced

no evidence to prove that any interference was "by reason of" Student's disability.  (Doc. 136

at 51.)[24]  Plaintiffs assert that they are entitled to summary judgment on their interference claims

because they have produced documentation showing that the boards refused to implement orders

in the hearing decision.  (Doc. 126-1 at 69.)  Although the court previously found Plaintiffs'

interference claims to be plausible, *A. ex rel. A.*, 976 F. Supp. 2d at 193–94, the court concludes

that, for the reasons below, the claims cannot survive summary judgment.

The court begins with HBOE.  HBOE contends that the only provision of the hearing

decision that applied to it was paragraph 8, and that HBOE fulfilled all of its responsibilities

under that paragraph by August 21, 2012, when it completed providing 90 hours of

compensatory education.  (*See* Doc. 152 at 14.)  Plaintiffs assert that HBOE interfered by failing

to act despite knowing that compensatory services did not commence until November 2011

---

[23] The boards refer to the requisite mental state as one of "bad faith," "gross
misjudgment," or "gross misconduct."  (Doc. 136 at 52; Doc. 152 at 21.)  Earlier in this case
Plaintiffs seemed to adopt that "steeper" standard.  *See A. ex rel. A.*, 976 F. Supp. 2d at 190.  For
the reasons discussed below, the court concludes that Plaintiffs cannot prove deliberate
indifference, and thus it is unnecessary to address the "steeper" standards.

[24] HBOE's position is that Plaintiffs have *conceded* that they are not claiming that any
action was taken against them "because of" Student's disability.  (Doc. 152 at 21.)  In support,
HBOE cites Plaintiffs' November 2012 Opposition to HBOE's Motion to Dismiss, in which
Plaintiffs stated that they were alleging "interference" rather than basic discrimination or
retaliation claims.  (*See* Doc. 77 at 50–51.)  The court does not read that statement as a
concession regarding any element of an "interference" claim.

(three months after the hearing decision), and despite being aware of Parent's safety concerns related to transportation that NBBOE had arranged for services at Talcott. (*See* Doc. 167 at 13–17.)  It is undisputed that HBOE did not start paying for the compensatory services until May 16, 2012, but Plaintiffs contend that under paragraph 8, HBOE and NBBOE had joint responsibility for the entire 180 hours of compensatory education and related transportation, and thus HBOE cannot be absolved of liability just because of events that occurred while NBBOE was paying for the first 90 hours of services. (*See id.* at 9–10.)

Assuming that HBOE was jointly responsible with NBBOE for issues related to paragraph 8 (regardless of how the boards divided responsibility for payment), the court cannot conclude that HBOE "interfered" by failing to act to investigate or correct the timeliness and safety issues that arose while NBBOE was paying for the compensatory education.  As for the timeliness issue, HBOE promptly approved NBBOE's list of proposed speech and language providers.  HBOE also acted in September 2011 by sending several emails expressing concern about starting the compensatory education and encouraging NBBOE to commence that education.  In October 2011, HBOE's attorney contacted NBBOE's attorney expressing her belief that the education was being implemented, and inquiring what the "true story" was.  Regarding safety, the evidence shows that HBOE learned about Parent's allegations on November 16, 2011, then learned about NBBOE's arrangements from Attorney McKeon's November 22, 2011 email, and participated in the December 8, 2011 PPT at which the issue was discussed.

Moreover, although it is possible to imagine additional actions that HBOE might have taken after it learned of the timeliness and safety issues, the court concludes that there is no evidence of any deliberate indifference.  To the contrary, even though NBBOE was at the time

paying for the services and making arrangements, HBOE was engaged in the process by encouraging NBBOE to commence the compensatory education, and by participating in the discussions to resolve the safety issue. Notably, although Plaintiffs contend that HBOE should have intervened to investigate or address the timeliness and safety issues, Plaintiffs had already sought to have CSDE itself intervene. The court concludes that HBOE is entitled to summary judgment on Plaintiffs' interference claims.

The court now turns to Plaintiffs' interference claims against NBBOE. The first area of alleged interference is the subject of hearing decision paragraph 7(a) and CSDE's Corrective Action No. 1: the limitations that NBBOE placed on the duration and scope of Dr. Golonka's work. The court agrees with CSDE's determination that the five-hour limitation in paragraph 7(c) applied only to the BCBA's work with Student, and not to IPP's consultative services under paragraph 7(a). That does not prove deliberate indifference, however, because paragraph 7(a) left room for interpretation regarding the scope of the consultative services, when those services could be deemed complete, and who could decide when the services were complete. Dr. Golonka's November 4, 2011 letter reflects his interpretation: his work was not yet complete. Dr. Carabillo supplied a second interpretation in her November 30, 2011 letter, suggesting NBBOE's belief that Dr. Golonka's work up to that time constituted the consultation required by paragraph 7(a). Here, the evidence is that Dr. Golonka did supply some consultative services, and IPP billed NBBOE for those services.[25] In light of the ambiguity in paragraph 7(a), the court concludes that Plaintiffs cannot show that, prior to CSDE's December 27, 2011 decision, NBBOE was deliberately indifferent with respect to that issue.

---

[25] As noted above, the billing records show that IPP billed for 208.75 hours of services—more than the 185 hours necessary to comply just with the first sentence of paragraph 7(c).

In its December 27 decision, CSDE recognized paragraph 7(a)'s ambiguity.  In

Corrective Action No. 1, CSDE required the PPT to meet with IPP representatives and

"determine the number of hours IPP expects the will require to fulfill the Hearing Officer's

Order." (Doc. 41-2 at 48.)  Between December 27, 2011 and the January 23, 2012 deadline in

Corrective Action No. 1, no PPT was held.  That failure, however, was due to scheduling

problems insufficient to prove deliberate indifference.

In his February 16, 2012 letter, Attorney Shaw noted that the PPT agreed at its

February 7, 2012 meeting to allow Dr. Golonka to spend sufficient time to perform the

requirements of paragraph 7(a).  Although it appears that the agreement was not documented in

the IEP (as Corrective Action No. 1 required), the evidence is that there was an agreement

permitting Dr. Golonka to spend "sufficient" time doing the consulting work required by

paragraph 7(a).  That evidence negates any claim of deliberate indifference up until that point.

Finally, at the March 5, 2012 PPT, Dr. Golonka presented his written recommendations.

The PPT did not adopt Dr. Golonka's recommendation for in-home parent training or for a

BCBA for the 2012–2013 school year.  That decision also cannot support a claim of deliberate

indifference, since neither paragraph 7(a) nor Corrective Action No. 1 required NBBOE to adopt

the consultant's recommendations.

The second area of alleged interference is the delay (of approximately three months) in

the commencement of the 180 hours of compensatory speech and language therapy required

under paragraph 8.  The August 2, 2011 hearing decision required 180 hours of compensatory

education to be provided during the 2011–2012 school year.  Talcott did not commence

providing the services until November 14, 2011.[26] For the reasons below, the court concludes that Plaintiffs cannot show that the delay was the result of any deliberate indifference.

Although New Britain was in its summer recess at the time of the August 2, 2011 hearing decision, by August 18 NBBOE had identified potential providers (*see* Doc. 131-8 at 37) and scheduled a PPT for August 24 with a representative from one potential provider. Prior to the August 24 PPT, NBBOE also communicated with HBOE and confirmed that HBOE would agree to the potential service providers. No provider was selected at the August 24 PPT because the boards still needed to confirm which company was able to provide the services.

NBBOE selected Talcott on August 25, 2011, and mailed Parent a consent form for his signature in the first week in September. On September 14, Ms. Niedzwiecki emailed Parent (and cc'd Attorney Shaw), reminding Parent that NBBOE needed him to return the signed consent form before it could begin arranging services with Talcott. Parent says that he did not receive the consent form in the mail. (Doc. 178 at 3.) Parent did not sign the Talcott consent form until the September 23, 2011 PPT meeting. The court cannot reasonably infer that, if NBBOE failed to mail the consent form, it was the result of any deliberate indifference, especially since NBBOE referred to the form in a reminder email sent to Parent and his attorney. It is unclear what became of the consent form that NBBOE mailed, but even viewing the facts in the light most favorable to Plaintiffs, NBBOE moved reasonably quickly to send the consent form to Parent after selecting Talcott, and was not responsible for approximately two weeks of

---

[26] Technically the delay did not explicitly violate any provision of the hearing decision, which did not specify a date by which the compensatory education was to begin. However, since the hearing decision did require that the 180 hours be completed during the 2011–2012 school year, it was necessary for the compensatory education to begin within a reasonable amount of time.

delay between mailing the form to Parent and the September 23 PPT meeting, where Parent signed the form in person.

There was an additional obstacle to overcome before Talcott's services could commence: arranging the schedule and transportation. There was nearly a month of delay between the September 23 PPT meeting and October 20, 2011, when Ms. Bengtson from the Talcott Center called Parent to arrange a schedule. However, it appears that at most only about one week of that time is attributable to NBBOE, since, by the time of Ms. Niedzwiecki's October 4 email, NBBOE understood that Talcott was in the process of contacting Parent to arrange a schedule. It is unclear why it took Talcott more than two weeks before contacting Parent, but no evidence suggests that delay is attributable to NBBOE.

Delays continued after Talcott contacted Parent on October 20. According to Parent, when Ms. Bengtson called him, he informed her that he could not agree on a schedule because NBBOE was refusing to provide the transportation, and because he was unable to provide the transportation himself. (Doc. 178 at 4.) In contrast, Ms. Niedzwiecki's November 9, 2011 email and letter state that she indicated at the September 23, 2011 PPT meeting that NBBOE would work out the transportation once Parent approved dates and times for the sessions. The evidence suggests—at most—a miscommunication regarding NBBOE's willingness to provide the transportation. The miscommunication led to delays, but is not sufficient to prove deliberate indifference.

The third area of alleged interference is NBBOE's handling of Parent's concerns about the safety of Student's transportation to and from Talcott. Parent raised those concerns in mid-November 2011. Parent states that Ms. Niedzwiecki responded to his concerns by saying that the transportation provider was asked to call ahead to Talcott to arrange for staff to meet Student.

(Doc. 41-1 at 64.)  The court agrees that Ms. Niedzwiecki's alleged suggestion—that, if he was concerned, Parent could simply follow the van—was not a helpful step towards resolution of the issue.  In any case, Attorney McKeon's November 22, 2011 email shows that he investigated and concluded that there was a plan in place.  When Attorney Shaw suggested that the driver was not complying with the plan, the issue became part of the agenda for the December 8, 2011 PPT meeting.  No deliberate indifference can be imputed from those facts.

There is a dispute about precisely what Attorney McKeon said (and to whom) at the December 8, 2011 PPT meeting regarding Parent's credibility.  Even assuming Plaintiffs' version of the facts, there is no evidence of deliberate indifference because after the PPT meeting NBBOE did request documentation from Talcott confirming the safety plan.  It appears that the documentation that Talcott produced (the December 19, 2011 letter) was not shared with Plaintiffs or Attorney Shaw for several months, but NBBOE had made an effort to confirm the safety plan in writing, so there can be no deliberate indifference stemming from NBBOE's actions after the December 8, 2011 PPT meeting.

In sum, for the reasons discussed above, Defendants are entitled to summary judgment on Plaintiffs' ADA and § 504 claims.

### 2.      Count 2: Section 1983 Claim

Plaintiffs' § 1983 claims were the subject of extensive analysis in the court's October 8, 2013 ruling.  Analyzing United States Supreme Court and other precedents, the court concluded that § 1983 could be used to enforce the IDEA, but that money damages would be available only if Plaintiffs could demonstrate that there was no relief available to them through the administrative process.  *See A. ex rel. A.*, 976 F. Supp. 2d at 184–88.  At the motion-to-dismiss stage, the court held:

> The administrative procedural safeguards, such as they are alleged to have been implemented, are failing Plaintiffs, there is no reasonable relief available to them under the administrative process, and consequently Plaintiffs ought to be able to bring suit under Section 1983 to enforce these provisions of the IDEA, including any monetary and any other damages that are available under this statute, as addressed *infra*.

*Id.* at 188.

The court also addressed HBOE's contention regarding the application of § 1983 to claims against municipalities (including Connecticut school boards) under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The court noted that under *Monell* a municipality is not liable under § 1983 unless the plaintiff's injury is inflicted by the execution of a governmental policy or custom. *See A. ex rel. A.*, 976 F. Supp. 2d at 196. Noting that an inference of such a policy or custom could be drawn from circumstantial evidence, the court held that "under the facts alleged in Plaintiffs' Amended Answer and Counterclaims and for reasons discussed at length *supra*, a claim that the Board evinced deliberate indifference to the allegations of discrimination as to show that the defendant intended the discrimination to occur is plausible, and consequently survives a motion to dismiss." *Id.* at 197.

NBBOE and HBOE both assert that Plaintiffs cannot prove any such official policy or custom. (Doc. 136 at 50; Doc. 152 at 41.) Now, at the summary judgment stage, the court agrees. Having determined that Defendants are entitled to summary judgment on Plaintiffs' ADA and § 504 claims, there is no basis for concluding that Defendants had a policy or custom of failing to implement hearing officers' orders or interfering with IDEA rights.

## IV.   Costs, Expenses, and Fees

In their March 4, 2014 motion for summary judgment, Plaintiffs requested an award of $439,915.88 for fees, costs, and expenses through February 10, 2014. (Doc. 126-1 at 130–31.) In a motion filed on October 31, 2014, Plaintiffs seek an additional $188,000 in fees for Attorney

61

Shaw's work between February 10, 2014 and October 31, 2014, bringing the total award of costs and fees that Plaintiffs seek to $627,915.88. (Doc. 198-1 at 5.) The boards describe Plaintiffs' request as "astounding," "exorbitant," "outrageous," "astonishing," and "astronomical," and urge the court to reduce or deny any award. (Docs. 173 at 40; 181-1 at 18, 28; 210 at 1; 211 at 1.) Each board also asserts that any fee award should be apportioned primarily against the other. (*See* Doc. 152 at 55; Doc. 181-1 at 33.) Plaintiffs maintain that the requested fees and costs are reasonable in light of the complexity and difficulty of the case. (*See* Docs. 217, 218.) Plaintiffs oppose apportionment of any award, and contend that the boards should be jointly and severally responsible for the fees and costs. (Doc. 126-1 at 131; Doc. 169 at 58.)

The court observes that—like most of the other issues in this case—the parties have litigated the question of attorneys' fees with gusto. The parties have filed more than 700 pages of legal memoranda on the cross-motions for summary judgment (not including exhibits or the extensive administrative record in this case), of which more than 180 pages are devoted to the question of costs and fees (not counting an additional 60 or so pages related to Plaintiffs' October 2014 Motion to Supplement). As in *Messier v. Southbury Training School*, No. 3:94-CV-1706 (EBB), 2015 WL 1439288 (D. Conn. Mar. 27, 2015), *appeal docketed*, No. 15-1552 (2d Cir. May 11, 2015), the parties' fees litigation approaches the level of "mania."[27] The admonition that the determination of fees "should not result in a second major litigation," *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)), has largely gone out the window.

### A.     Prevailing Party Status

---

[27] *See also M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 233, 247 (D. Conn. 2008) (IDEA case was "tremendously over-litigated and over-briefed"). The court notes that Attorney Shaw represented the plaintiffs in both *Messier* and *M.K.*

All of the relevant statutes in this case include fee-shifting provisions. *See* 20 U.S.C. § 1415(i)(3) (IDEA); 29 U.S.C. § 794a(b) (Section 504); 42 U.S.C. § 12205 (ADA); 42 U.S.C. § 1988(b) (Section 1983 actions). Each of those provisions authorizes awards to the "prevailing party." Regarding Plaintiffs' claim under 20 U.S.C. § 1415(i)(3), the parties dispute whether Plaintiffs are prevailing parties in the due process case. Plaintiffs maintain that, as a result of the hearing decision, they are prevailing parties. (Doc. 126-1 at 100, 109–10.) NBBOE suggests that the "limited nature" of Plaintiffs' relief in the due process case might warrant a denial of fees. (Doc. 181-1 at 21.)[28] According to NBBOE, "plaintiffs lost on all of their major issues, including out-of-district placement, transportation to that placement, in-home services, and the appropriateness of the 2008–2009 school year." (*Id.* at 31.) Plaintiffs insist that they achieved a substantial victory in the due process case. (Doc. 196 at 70–71.)

A winning party in an IDEA administrative proceeding is a "prevailing party" under the principles of *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001). *See Mr. L. v. Sloan*, 449 F.3d 405, 407 (2d Cir. 2006) (citing *A.R. ex rel. R.V. v. New York City Dep't of Educ.*, 407 F.3d 65, 76 (2d Cir. 2005)). Under *Buckhannon*, a "prevailing party" under federal fee-shift statutes "is one who has achieved a judicially sanctioned change in the legal relationship among the parties, such as a judgment on the merits or a court-ordered consent decree." *Mr. L.*, 449 F.3d at 406 (citing *Buckhannon*, 532 U.S. at 604). To be a prevailing party, it is not necessary for a plaintiff to prevail on all issues. *M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 233, 243–45 (D. Conn. 2008) (although

---

[28] Asserting that the only award against HBOE in the hearing decision was to pay for 90 hours of compensatory education, HBOE contends that Plaintiffs are not prevailing parties as against HBOE. (Doc. 152 at 44.) The court interprets that argument as going to the question of apportionment rather than prevailing-party status.

they did not succeed on every issue, IDEA plaintiffs were prevailing parties at administrative hearing).

The court concludes that, although Plaintiffs were not successful on all of their claims in the due process case, they nevertheless obtained sufficient favorable determinations in the hearing decision to qualify as "prevailing parties."  As discussed above, the Hearing Officer found, among other things, that the boards violated Parents' procedural rights and that the programs provided by the boards for the 2009–2010 and 2010–2011 school years were not appropriate and did not provide Student with a FAPE.  The Hearing Officer also ordered an array of relief, including the relief in paragraphs 7, 8, and 9, which are discussed in detail above. Because the hearing decision worked a change in the legal relationship among the parties, the court concludes that Plaintiffs are "prevailing parties" in the due process case.

### B.    Fee Award

For actions brought under 20 U.S.C. § 1415, "the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B).  The statute requires that, if fees are awarded, they "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished.  No bonus or multiplier may be used in calculating the fees awarded under this subsection." *Id.* § 1415(i)(3)(C).  The statute further directs the court to reduce the amount of fees awarded if it finds that:

> (i) the parent, or the parent's attorney, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy;
> (ii) the amount of the attorneys' fees otherwise authorized to be awarded unreasonably exceeds the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable skill, reputation, and experience;
> (iii) the time spent and legal services furnished were excessive considering the nature of the action or proceeding; or

> (iv) the attorney representing the parent did not provide to the local educational
> agency the appropriate information in the notice of the complaint described in
> subsection (b)(7)(A).

*Id.* § 1415(i)(3)(F). Any such reductions, however, "shall not apply in any action or proceeding

if the court finds that the State or local educational agency unreasonably protracted the final

resolution of the action or proceeding or there was a violation of this section." *Id.*

§ 1415(i)(3)(G).

To determine the amount of a prevailing party's fee award, the court begins by

calculating the "lodestar": "the product of a reasonable hourly rate and the reasonable number of

hours required by the case." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)

(citing *Perdue v. Kenny A. ex. Rel. Winn*, 559 U.S. 542 (2010), and *Arbor Hill Concerned

Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182 (2d Cir. 2007)).[29] Calculation of

the "lodestar" creates a "presumptively reasonable fee," and, absent "extraordinary

circumstances," the court must calculate the lodestar figure "as a starting point." *Millea*,

658 F.3d at 166. The fee applicant must "submit appropriate documentation to meet 'the burden

---

[29] HBOE and Plaintiffs dispute the methodology that the court should use to calculate
attorneys' fees. Plaintiffs contend that under *Perdue*, the court must use the "lodestar approach."
(*See* Doc. 126-1 at 103 n.18.) HBOE asserts that *Perdue* did not abrogate *Arbor Hill*—in which
the Second Circuit found the "lodestar" metaphor unhelpful, in favor of a multifactor analysis
including the twelve so-called *Johnson* factors—and that the court should therefore follow the
*Arbor Hill* approach. (Doc. 173 at 31–32.) The court concludes that best course is to avoid
becoming fixated on any particular terminology, and to instead consider both *Arbor Hill* and
*Perdue* in resolving the fees question. *See Millea*, 658 F.3d at 166 (relying on both *Arbor Hill*
and *Perdue*); *Echevarria v. Insight Med., P.C.*, 102 F. Supp. 3d 511, 515 n.2 (S.D.N.Y. 2015)
(discussing *Arbor Hill* and *Perdue*, and ultimately deciding to consider both); *K.L. v. Warwick
Valley Cent. Sch. Dist.*, No. 12 Civ. 6313(DLC), 2013 WL 4766339, at *6 (S.D.N.Y. Sept. 5,
2013) (citing both *Perdue* and *Arbor Hill*). However, since 20 U.S.C. § 1415(i)(3)(C)
specifically directs the court not to apply any bonus or multiplier, the court will not—as it
analyzes fees related to the due process hearing—consider the "less objective factors" like risk of
litigation, complexity of issues, and skill of the attorneys. *Savoie v. Merchants Bank*, 166 F.3d
456, 460 (2d Cir. 1999).

of establishing entitlement to an award.'" *Fox*, 563 U.S. at 838 (quoting *Hensley*, 461 U.S. at 437).

Here, as in *M.K.*, these consolidated cases have been over-litigated and over-briefed, and the court will scrutinize the records submitted by counsel and will exclude from the fee calculation hours that were not reasonably expended. Regarding a reasonable rate, the court will use current rather than historic hourly rates. *See Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006); *Messier v. Southbury Training Sch.*, No. 3:94-CV-01706 (EBB), at 2–3 (D. Conn. Oct. 18, 2011), ECF No. 1124 (absent finding that delay in litigation was caused by party seeking fees or that current rate does not reflect loss attributable to delay, current rate is appropriate for calculating lodestar amount in protracted litigation); *M.K.*, 554 F. Supp. at 248 (court would use current rather than historic hourly rates). To arrive at the prevailing rate as required by 20 U.S.C. § 1415(i)(3)(C), the court will review recent fee awards in other IDEA cases in this District for attorneys with comparable experience.[30]

As HBOE points out, the parties have not had the benefit of the court's ruling on the substantive issues presented in the summary judgment motions. (*See* Doc. 210 at 5.) Therefore, as in *M.K.*, 554 F. Supp. 2d at 248, the court will allow all parties to file supplemental briefs— within 20 days of the date of this ruling and not exceeding 10 pages—on the issue of reasonable

---

[30] The court's review will include several IDEA cases litigated by Attorney Shaw: *P.J. v. State of Connecticut*, No. 2:91-cv-180(RNC) (D. Conn. Mar. 31, 2016), ECF No. 803 (class action commenced in 1991; Judge Martinez concluded that Attorney Shaw's requested $500 hourly rate was unreasonable, and that—based on the court's familiarity with the prevailing rates in the community, the subject matter, and the amount and quality of work performed—a $450 hourly rate was appropriate); *Messier v. Southbury Training School*, No. 3:94-CV-1706 (EBB), 2015 WL 1439288, at *5 (D. Conn. Mar. 27, 2015), *appeal docketed*, No. 15-1552 (2d Cir. May 11, 2015) (class action commenced in 1994; Judge Burns left "intact" hourly rates for attorneys ranging from $200 to $500 over four years); and *M.K. ex rel. Mrs. K. v. Sergi*, 578 F. Supp. 2d 425, 428 (D. Conn. 2008) (Magistrate Judge Garfinkel concluded that a reasonable, prevailing market hourly rate was $375).

fees and costs in light of the court's rulings on summary judgment.[31]   Each party will then have 20 days to respond; responses shall not exceed 10 pages.   No replies will be permitted without leave of the court.[32]

### Conclusion

Each of the pending summary judgment motions (Docs. 126, 128, 129) is GRANTED IN PART and DENIED IN PART.

The August 2, 2011 Final Decision and Order is AFFIRMED in all respects expect that it is REVERSED and REMANDED insofar as it denied an in-home program.   On remand, the Hearing Officer may take additional evidence related to the issue of an in-home program, and shall explain the rationale for either ordering or denying such a program.

HBOE and NBBOE are entitled to summary judgment on Plaintiffs' ADA, § 504, and § 1983 claims.

Plaintiffs are entitled to recover reasonable attorneys' fees, in an amount to be determined after the filing of supplemental briefs, as described above.

Dated this 14 day of July, 2016.

/s/- GWC
_____
Geoffrey W. Crawford, Judge
United States District Court

---

[31] The issue of attorneys' fees and costs is ordinarily addressed post-judgment on a motion under Fed. R. Civ. P. 54.   However, since the nature of Plaintiffs' suit under 20 U.S.C. § 1415(i)(3)(B) itself concerns fees, it appears that, as in *M.K.*, it is appropriate to rule on the fees issue once the supplemental briefing is complete.

[32] The parties also have disputes over paralegal fees, expert fees, costs, prejudgment interest, and apportionment.   Those issues appear to be fully briefed, and the court will address them in its ultimate ruling on fees and costs.